Filed 11/27/13

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CESAR OMAR SANCHEZ,<br><br>    Defendant and Appellant. | B241561<br><br>(Los Angeles County Super. Ct.<br> No. BA361075) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Jr., Judge.  Affirmed in part, reversed in part and remanded.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, and Jaime L. Fuster, Deputy Attorney General, for Plaintiff and Respondent.

_____

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part G of the Discussion.

The victim was shot and killed following a dispute over drugs and money. Defendant, who was not alleged to be the shooter, was prosecuted on separate theories of aiding and abetting: (1) first degree felony murder committed during the course of a kidnapping; and (2) second degree murder with target offenses of assault and kidnapping. In response to a jury question about the definition of second degree murder, and over defense objection, the trial court instructed the jurors they need not agree on a theory of guilt, as long as all the jurors believed defendant committed murder. The jury convicted defendant of first degree murder.

In the published portion of this opinion, we hold the trial court's response to the jury's question was error to the extent it (1) sanctioned a verdict that was not unanimous as to degree, and (2) advised the jury defendant, rather than the actual killer, acted with malice aforethought. We therefore reverse the conviction of first degree murder and remand to allow the prosecution to either retry defendant or accept a reduction of the offense to second degree murder.

***Procedural Background***

The jury found defendant and appellant Cesar Omar Sanchez guilty in count 1 of the first degree murder of Marco Antonio Parra (Pen. Code, § 187, subd. (a)),[1] in count 2 of the attempted carjacking of Jovani Ortega (§§ 664, 215, subd. (a)), in count 3 of the second degree robbery of Ortega (§ 211), and in count 4 of possession of a firearm by a felon (§ 12021, subd. (a)(1)). The jury also found true allegations that defendant personally used a firearm as to counts 2 and 3 (§ 12022.53, subd. (b)).[2]

Defendant was sentenced to 25 years to life in prison on count 1. On count 2, the trial court imposed a consecutive term of 10 months (one-third the midterm of 30

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] Codefendant Michael Castrellon was found not guilty of murder, the only charge against him.

2

months), with an enhancement of 10 years on the firearm use allegation. With respect to count 3, defendant was sentenced to a concurrent term of one year (one-third the midterm of three years) enhanced by ten years for use of a firearm. The court stayed sentencing on count 4.[3]

Defendant contends the trial court erroneously instructed the jury that it did not have to be unanimous as to the theory of guilt to find him guilty of murder.[4] We agree.

In the unpublished portion of the opinion, we hold the Attorney General is correct that the sentences in counts 2, 3, and 4 were unauthorized and must be corrected. We remand the matter to the trial court for resentencing on counts 2-4.

# FACTS[5]

## *Trial Testimony Regarding the Kidnapping and Murder*

Laura Ramos was in a long-term relationship with Parra, her sister Marcela was married to Danny Chavez, and her sister Martha was married to Luis Arturo Garcia. The couples were friendly with one another and interacted socially. Both Laura and Martha testified at trial under a grant of immunity.

On the morning of April 22, 2008, Martha received a call from the wife of Walter Quevedo, a friend of Garcia's, asking about Garcia's whereabouts. Later that morning, Garcia, sounding concerned, called Martha at work and mentioned that he and Parra had a dispute about money. A little later, Marcela called Martha and also mentioned the

---

[3] The sentences on counts 2 and 3 were corrected from the pronounced sentences in a nunc pro tunc order issued on July 2, 2012.

[4] In his opening brief, defendant alternately argued that if the trial court concluded defense counsel failed to preserve his claim, counsel rendered ineffective assistance. The Attorney General conceded the claim was not waived, and defendant subsequently abandoned his ineffective assistance of counsel claim in his reply brief.

[5] Defendant did not testify and called no witnesses at trial.

dispute. Marcela asked Martha to meet her at the parking lot of a shopping center on Alameda and Florence. Martha left work and drove her Dodge Ram to the parking lot. About 15 minutes later, Marcela arrived with Chavez and the women's mother in a gray pickup truck. Chavez appeared very concerned and worried. He said he needed to talk to Parra to clear up an accusation by Quevedo that Parra had taken over $1 million.

After Chavez left at around 2:00 p.m., Martha called Laura, told her that there was something going on involving Parra, and asked Laura to meet her at the parking lot. About 15 or 20 minutes later, Laura arrived in her Mercedes. Martha told Laura that Chavez and Garcia were trying to get in touch with Parra, and that Parra supposedly took $1.5 million from Quevedo. Laura was shocked and called Parra to tell him about the accusation. Laura told Parra to meet them at the parking lot.

Parra arrived at the parking lot in his van about 10 minutes later and parked next to Laura's car. He was acting normally and did not appear to be worried or angry. He got into the cab of Martha's truck, where everyone else was sitting, and they discussed the missing money. Parra told Marcela to call Chavez. Marcela called Chavez, said Parra wanted to talk to him, and told him where they were. Parra called his cousin, "Pula," and told him, "Some money's missing and now they are trying to blame me." Parra seemed very concerned about the money problem.

About 20 to 30 minutes later, Chavez arrived in his truck at the parking lot. Garcia arrived a minute later and parked his Toyota 4Runner, blocking Martha's truck. Garcia and at least two other men got out of Garcia's 4Runner with handguns. Parra got out of Martha's truck and tried to run. The gunmen stopped Parra and told him to get in a car parked behind Martha's truck. One of the gunmen had a long-sleeve dark blue shirt.

At the same time, several men exited a gold four-door sedan parked behind Martha's truck. Parra asked, "Why so many?" Parra called his cousin "Pula" and quickly said, "They picked me up. They picked me up." The men walked Parra to the gold sedan. The women in Martha's truck got out and screamed for the men to stop and leave Parra alone. Laura screamed at Garcia, "Tell them to stop. Why are they taking him like this?" Garcia looked angry and did not try to prevent the men from taking Parra.

4

Martha saw one person in the driver's seat of the gold sedan. Parra was pushed into the back seat of the car. Some of the men got into the car with Parra and quickly drove away. Martha heard a gunshot coming from the car before it exited the parking lot.

Huntington Park Police detectives responding to a call of "shots fired with one down" found the dead body of Parra lying face up on the northbound lane of Albany Street. The detectives did not see anyone fleeing the scene on foot or in a car. There was blood near the body, but no trail of blood in the vicinity. Officers recovered three .45-caliber shell casings and one .45-caliber bullet at the scene. All three casings were fired from the same semiautomatic pistol. An autopsy showed that Parra died as a result of four gunshot wounds.

*Post-Murder Interviews*

Approximately 90 minutes after Parra was taken from the parking lot, Laura went to the sheriff's station, where she was interviewed by Sergeant Mitchell Loman. Laura said she spoke to her sisters about the missing money, and that three cars arrived at the parking lot with a "bunch of guys" after Marcela called Chavez. She described a heavy gunman with a long-sleeved blue shirt and said that Parra had been shoved into a sedan by several men. After she was informed Parra had been murdered, Laura said that Parra had been accused of taking $1.5 million from Quevedo, a truck driver, the night before Parra's murder. She said the money did not belong to Quevedo, but that he was transporting it. Another person was supposed to pick up the money. Parra used to collect money from Quevedo and deliver it to somebody else, but Parra had nothing to do with the missing money. Laura said Chavez and Garcia may have been dealing drugs with Quevedo.

On June 17, 2008, Martha selected Jesus Corrales from a photographic six-pack lineup as one of the gunmen who forced Parra into the sedan. She wrote on the form, "I believe this is the guy that was holding the gun. He was wearing a baseball cap." She

had never seen Corrales before the kidnapping. Martha also said there could have been three men who got out of her husband's vehicle, but she only remembered two gunmen.

On November 20, 2008, Martha was shown other photographic six-pack lineups, which included defendant and Castrellon. Martha did not identify anyone in the lineups. Laura was also shown the six-pack lineups and selected Castrellon as one of the men involved in the kidnapping. Laura wrote on the identification form, "This guy was the one that was pushing [Parra] inside the car. He was wearing a long-sleeve, dark blue [shirt] . . . [and] was holding a gun, pointing it to [Parra]'s right side."

In a recorded interview in November 2008, Castrellon stated that Chavez asked defendant to intimidate somebody who owed him money. Castrellon was friends with defendant, so he lent defendant his "weird caliber" semiautomatic pistol and agreed to back him up. Castrellon arrived at the parking lot in a 4Runner with defendant, Garcia, Jose Larios, and some others. A gold Camry also arrived at the scene, and someone got out of the Camry with a gun. Castrellon said defendant was pushed into the Camry with Parra. Castrellon left the scene with Chavez.

In another interview on December 9, 2008, Castrellon mentioned that defendant had been placed in a cell with him and told him not to talk to law enforcement about the incident. Castrellon then stated that on the night before the shooting, he, Chavez, Garcia, Quevedo, Larios, defendant, and others were at a house in Compton. The group went to Quevedo's truck yard to look for the missing money and "dope." Larios had his arms broken in connection with the missing money. Castrellon said that Garcia gave him the gun that was recovered from Ortega's van. Castrellon went to the parking lot on the day of the shooting believing there was going to be a meeting to get the missing money. He thought he was acting as backup at the meeting. After they arrived at the parking lot, Corrales, who had a .45-caliber gun, pushed Parra and defendant into the Camry. Defendant later called Castrellon and told him Corrales shot Parra in the arm inside the car and then shot Parra again outside the car, and "the drug cartel" was involved in the incident.

6

*Testimony Regarding Counts 2-4 and Additional Scientific Evidence*

At approximately 3:10 p.m. on the day of Parra's murder, Ortega was sleeping in his van, which was parked in front of a tow yard in Huntington Park. Defendant entered his van with a gun, pointed it at Ortega's head, and told Ortega to get him out of there. Ortega said the keys were in the ignition, and that he could take the van. Defendant told Ortega to take off his shirt. Defendant removed two shirts and put on Ortega's shirt. Defendant then left the van and walked away, leaving a white shirt, a blue shirt, and a gun in the back of the van.

Detectives recovered a white long-sleeve T-shirt, a blue checkered long-sleeve dress shirt, and a functional handgun from the back of Ortega's van. There were eight live rounds in the gun's magazine. The gun was "kind of rare" and incapable of firing .45-caliber ammunition. The white shirt was sweaty with holes in it. The blue shirt was not damaged.

A criminalist later found bloodstains on the sleeves of both shirts. DNA testing showed that Parra was a "possible contributor" to the DNA found on the blue shirt. The DNA profile from the white shirt exactly matched Parra's DNA profile. Defendant was a "possible contributor" to the DNA mixture found on the grip of the handgun. Castrellon's DNA profile matched the profile found on the slide hammer of the gun. Defendant's DNA profile exactly matched the profile obtained from the neck area of the white shirt. Defendant was a "possible contributor" to the DNA mixture found on the neck area of the blue shirt. Parra and Castrellon were not contributors to this DNA sample.

7

# DISCUSSION

## A. *Claim of Erroneous Jury Instructions on Murder*

At the prosecution's request, the trial court instructed the jury on two theories of murder:  (1)  first degree felony murder if Parra was killed during the commission or attempted commission of a kidnapping that defendant committed, attempted, or aided and abetted;  and  (2)  second degree murder if the murder was the natural and probable consequence of an assault or a kidnapping.[6]  In a portion of its response to a jury question during deliberations on the definition of second degree murder, the jurors were instructed pursuant to Judicial Council of California Criminal Jury Instructions, CALCRIM No. 548:  "You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories.  *You do not all need to agree on the same theory*."  (Emphasis added.)

Defendant contends the trial court's instruction expressly negating the need for juror unanimity as to the theory of guilt was error.  Defendant reasons the prosecution's two theories of murder supported different degrees of murder, and juror unanimity was therefore required as to the theory of guilt.  If the jury followed the instruction, defendant argues that all the jurors may have agreed defendant committed murder, but it cannot be determined whether the jurors unanimously agreed defendant committed first degree murder.  This is correct.

---

[6]  Effective 1990, murder in the perpetration of kidnapping is murder in the first degree.

**B.** *Discussion of Jury Instructions between the Trial Court and Counsel*

The prosecutor produced a working set of jury instructions, which were finalized after discussion between the trial court and counsel. From the outset, there were disputes over the instructions relating to the natural and probable consequences theory of liability.

Defendant's counsel expressed the view that instructions on the natural and probable consequences doctrine were unnecessary, because the prosecution case, if believed, established a first degree felony murder based on aiding and abetting a kidnapping. The prosecutor proposed aiding and abetting instructions, including the concept of natural and probable consequences, identifying attempted robbery, kidnapping, and assault as possible target offenses. The trial court stated it felt the natural and probable consequences instruction was proper based on attempted robbery and kidnapping as target offenses. Defense counsel pointed out attempted robbery and kidnapping would support a first degree felony-murder conviction and identifying those crimes as target offenses was unnecessary. The court replied, "I'm going to give it."

After further discussion, the trial court ruled there was insufficient evidence to support instructing on attempted robbery as a target offense under the natural and probable consequences doctrine. The court agreed to the prosecutor's request to include "assault or kidnapping" as target offenses in the instruction.

When the discussion turned to the felony-murder instructions, the prosecutor acknowledged that the jury could return a verdict of second degree murder based on murder being a natural and probable consequence of an assault, and that the case did not necessarily involve only first degree murder. He suggested the jury be allowed to convict defendant of either first or second degree murder, "*depending upon what theory of culpability they agree on unanimously* (italics added)."

Defense counsel repeated his objection to the instruction on natural and probable consequences. The trial court stated, "They are two separate, distinct offenses."

9

There was no specific discussion regarding an instruction defining second degree murder. The jury was provided guilty and not guilty verdict forms for first and second degree murder.

## C. *Initial Instructions to the Jury Provided By the Court and Arguments of Counsel*

The trial court instructed the jury pursuant to CALCRIM Nos. 400 and 401 on aiding and abetting generally. The court instructed the jury with respect to the natural and probable consequences doctrine with CALCRIM No. 403, identifying "kidnapping or assault" as the target offenses.[7]

The trial court instructed the jury on murder generally, stating the jury had to decide whether the killing was unlawful and if so, what specific crime was committed.

---

[7] The jury was instructed under CALCRIM No. 403: "Before you may decide whether a defendant is guilty of murder, you must decide whether they are guilty of kidnapping or assault. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of kidnapping or assault; [¶] 2. During the commission of the kidnapping or assault, a co-participant in that kidnapping or assault committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the kidnapping or assault. [¶] A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include an innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the kidnapping or assault, then the murder was not a natural and probable consequence of the murder or assault. [¶] The People are alleging that the defendants originally intended to aid and abet kidnapping [or] assault. [¶] If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder. *You do not need to agree about which of these crimes the defendant aided and abetted*." (Emphasis added.)

(CALCRIM No. 500.) The court then instructed the jury on felony murder under CALCRIM No. 540B, identifying only kidnapping as the underlying felony.[8]

The trial court also instructed that a conviction for felony murder required a finding that the kidnapping and the act causing death be part of one continuous transaction, which included the jury's consideration of whether the death was a natural and probable consequence of the kidnapping. (CALCRIM No. 549.) The jury was given instructions on the elements of both kidnapping and simple assault. (CALCRIM Nos. 1215 and 915.)

In closing argument, the prosecutor outlined the two theories available to convict defendant and Castrellon of murder: (1) conviction of first degree felony murder if

---

[8] Felony murder was defined as follows in CALCRIM No. 540B: "The defendants are charged in Count One with murder, under the theory of felony murder. [¶] The defendant may be guilty of murder, under the theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed, or attempted to commit, or aided and abetted in a kidnapping; [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing kidnapping; [¶] 3. If the defendant did not personally commit or attempt to commit kidnapping, then a perpetrator, whom the defendant was aiding and abetting, personally committed or attempted to commit kidnap; [¶] 4. While committing or attempting to commit kidnapping, the perpetrator caused the death of another person; [¶] AND [¶] 5. There was a logical connection between the cause of death and the kidnapping. The connection between the cause of death and the kidnapping must involve more than just their occurrence at the time and place. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] To decide whether the defendants and the perpetrator committed or attempted to commit kidnapping, please refer to a separate instruction that I will give you on those crimes. To decide whether the defendant aided and abetted a crime, please refer to the separate instructions . . . on aiding and abetting. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder. [¶] The defendant must have intended to commit, or aid and abet the felony of kidnapping before or at the time the perpetrator caused the death. [¶] It is not required that the person die immediately, as long as the cause of death and the felony are part of one continuous transaction. [¶] It is not required that the person killed be the intended victim of the felony. [¶] It is not required that the defendant be present when the death occurs."

11

defendants were involved in a kidnapping and Parra was killed during the kidnapping; and (2) conviction of second degree murder if the jury did not find there was a kidnapping, but instead found defendant and Castrellon were present to assault Parra in order to obtain the missing drugs and money, and Parra's murder was a natural and probable consequence of the assault. The prosecutor emphasized that the jury had to agree unanimously as to the degree of murder to convict: "It doesn't matter what theory you use to get to a degree as long as you all agree unanimously—all 12 of you agree—on what degree you fix the murder at." In his closing argument, defense counsel conceded that, if defendant was guilty of kidnapping murder, he could only be guilty of first degree murder.

After closing arguments, the trial court instructed the jury with respect to the deliberations and the verdict forms, pursuant to CALCRIM 640. The instruction detailed the procedure for the jury to follow in considering the various possible verdicts.[9]

---

[9] Pursuant to CALCRIM No. 640, the jury was instructed as follows: "You will be given verdict forms for guilty or not guilty of first degree murder and second degree murder. [¶] You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder. [¶] As with all of the charges in this case, to return a verdict of guilty or not guilty on a count, you must all agree on that decision. [¶] Follow these directions before you give me any completed and signed final verdict forms. Return the unused verdict forms to me, unsigned. [¶] 1. If all of you agree that the People have proved beyond a reasonable doubt that a defendant is guilty of first degree murder, complete and sign that verdict form. Do not complete and sign any other verdict forms. [¶] 2. If all of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms. [¶] 3. If all of you agree that the defendant is not guilty of first degree murder, but also agree that the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and the form for guilty of second degree murder. . . . [¶] 4. If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and inform me that you cannot reach a further agreement. . . . [¶] 5. If all of you agree that the defendant is not guilty of first degree murder and not guilty of second degree murder, complete and sign the verdict forms for not guilty of both. . . ."

**D.** *Jury Question Regarding Second Degree Murder and Further Instructions*

Following instructions, the jury deliberated for about an hour on April 26, 2012. During deliberations on April 27, the jury sent a note to the trial court requesting clarification: "We need more [information] on the [difference between first and second] Degree Murder. [¶] Page 37 state[s] what [first] Degree is But what is [the definition] of [second] Degree."[10]

Upon receipt of the jury's query, the trial court realized it had instructed on the natural and probable consequences doctrine but had not explained to the jury that the natural and probable consequences doctrine was the basis for a second degree murder conviction. In a discussion outside of the jury's presence on the morning of April 30, the court acknowledged the omission and stated that it planned to answer the jury's questions with CALCRIM Nos. 548 (Murder: Alternative Theories) and 520 (First or Second Degree Murder With Malice Aforethought), which were proposed by the prosecution.

Defense counsel objected to the last sentence of CALCRIM No. 548 ["You do not all need to agree on the same theory"], on the basis that it could confuse the jury into believing it did not have to unanimously agree on the felony-murder/kidnapping theory to find defendants guilty of first degree murder. The trial court overruled the objection, reasoning the jury had been clearly instructed that the verdicts were required to be unanimous and instructed as follows pursuant to CALCRIM No. 548: "The defendants have been prosecuted for murder under two theories: (1) malice aforethought, and (2) felony murder. [¶] Each theory of murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. *You do not all need to agree on the same theory*." (Emphasis added.)

The trial court also instructed the jury on the elements of malice aforethought under CALCRIM No. 520, as follows: "The defendants are charged with murder in

---

[10] Page 37 refers to the felony-murder instruction, CALCRIM No. 540B.

violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; AND [¶] 3. He killed without lawful excuse or justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] *An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.* [¶] If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree." (Emphasis added.)

The trial court advised the jury it should send additional notes if it remained confused about the instructions. The jury deliberated for two and a half hours, asking no additional questions, before convicting defendant of first degree murder.

### E. *Analysis*

As noted above, defendant argues the trial court committed reversible error by including the language in CALCRIM No. 548, indicating the jury need not be unanimous

14

as to the theory of guilt because the two theories presented lead to different degrees of murder. For the reasons that follow, we agree.

"A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

When a crime is divided into degrees, the jury must find the degree of the crime. (§ 1157.) "It is settled, however that 'in a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offenses is defined by statute.' (*People v. Milan* (1973) 9 Cal.3d 185, 195.)" (*People v. Guerra* (1985) 40 Cal.3d 377, 386; accord, *People v. Moore* (2011) 51 Cal.4th 386, 413; *People v. Millwee* (1998) 18 Cal.4th 96, 160.) We have no quarrel with this principle of law, cited by the Attorney General, but the rule has no application in this case because there was only one theory of first degree murder.

The final instruction the jury received on unanimity was that it need not agree on the theory of guilt, even though presented with alternate theories of liability which led to different results as to the degree of the murder. Unanimity was required in this case as to the theory of guilt as a result of different theories supporting different *degrees* of murder. The prosecutor understood the need for unanimity at the time he requested instructions on natural and probable consequences, specifically telling the trial court the jury could return

15

a verdict of murder in the first or second degree, depending on what theory they unanimously agreed upon.[11]

The trial court's supplemental instruction in response to the jury's question regarding the meaning of second degree murder undermined the notion of unanimity as to degree by unambiguously stating: "You do not all need to agree on the same theory." There is no way to determine, on the record presented, whether the jury followed the instruction during deliberations stating unanimity was not required, or the earlier instruction pursuant to CALCRIM No. 640, which set forth a different approach to the verdict forms on both degrees of murder.

There is another aspect of the trial court's instruction on malice that was inaccurate in the case, although it could not have been prejudicial as to second degree murder. The instruction on malice provided during deliberations directed the jury to consider whether *defendant* acted with malice under the natural and probable consequences theory of guilt offered by the prosecution. The jury was advised malice required that "[w]hen the defendant acted, he had a state of mind called malice aforethought; AND . . . . He killed without lawful excuse or justification." (CALCRIM No. 540.)

Contrary to the trial court's instructions, the jury was not required to find that *defendant* acted with malice under the natural and probable consequences doctrine; malice was required on the part of the *actual perpetrator* of the murder. "Because the natural and probable consequences doctrine is premised on the idea that the aider and abettor intended only to commit some lesser crime, a juror who finds the aider and abettor culpable for murder under that doctrine has necessarily concluded the aider and abettor did not even *intend to commit murder*, let alone premeditate it. Consequently, under the natural and probable consequences doctrine, the only premeditation which might elevate an aider and abettor's liability for murder to liability for *first degree*

---

[11] The trial court relied on CALCRIM instructions in this case. We note that CALJIC No. 8.74 expressly requires unanimity as to the degree of the offense.

16

*murder* would be the premeditation of the direct perpetrator." (*People v. Ramirez* (2013) 219 Cal.App.4th 655, 678.) The natural and probable consequences doctrine "allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony." (*People v. Culuko* (2000) 78 Cal.App.4th 307, 322; *People v. Karapetyan* (2006) 140 Cal.App.4th 1172, 1178.)

Directing the jury's attention to a nonexistent requirement that defendant killed with malice may have inadvertently undermined the notion that the killing of Parra was murder in the second degree. The jury had two choices to make in deciding what crime was committed—either first degree felony murder or second degree murder under the natural and probable consequences doctrine. The trial court's instruction on the latter theory was inconsistent with the prosecution's theory of second degree murder, which was not that defendant killed, but instead that defendant was present to commit an assault in order to assist others in recovery of the missing money and drugs, and the murder of Parra by another was a natural and probable consequence of that intended assault. By providing a definition of second degree murder that did not fit the facts, the jury was left with a choice of first degree murder by default.

The instruction defining malice overstated the prosecution's burden under the natural and probable consequences doctrine by requiring the jury to find defendant acted with malice, but any error in this regard was certainly nonprejudicial as to second degree murder. Given the nature of the killing—an apparent execution related to a large drug trafficking organization—the existence of malice sufficient for second degree murder on the part of the actual killer cannot be disputed.

Under the circumstances of this case, the trial court erred in instructing that unanimity as to the theory of guilt was not required, and that the jury had to find that defendant killed with malice. The remaining issue is prejudice and remedy.

**F. *Remedy***

"When the jury is 'misinstructed on an element of the offense . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt.' (*People v. Hayes* (1990) 52 Cal.3d 577, 628 [misinstruction on 'immediate presence' element of robbery required reversal under *Chapman* [*v. California* (1967) 386 U.S. 18, 24] standard]; see also *People v. Harris* (1994) 9 Cal.4th 407 [misinstruction on 'immediate presence' element of robbery was harmless beyond a reasonable doubt].)" (*People v. Wilkins* (2013) 56 Cal.4th 333, 348.) Our Supreme Court has explained that instructional error is harmless beyond a reasonable doubt in situations in which both proper and improper theories of guilt are presented to the jury, if other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the finding necessary for malice. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205 (*Chun*).)

There are no "other aspects of the verdict or the evidence" in this case to indicate the jurors unanimously found defendant committed first degree felony murder. The instruction advising the jury that unanimity was not required as to the theory of guilt was therefore prejudicial error as to the finding of first degree murder. As explained below, "however, here the error affected only the question of the degree of the murder." (*People v. Ford* (1964) 60 Cal.2d 772, 798-799, overruled on another point in *People v. Satchell* (1971) 6 Cal.3d 28.) We are satisfied that under the test employed in *Chun*, *supra*, 45 Cal.4th at pages 1204-1205, the proper remedy is to reverse the conviction of first degree murder and remand the cause to the trial court with directions to allow the prosecution to either retry the case or accept a reduction of the offense to second degree murder.

Defendant makes no argument that the jury was not properly given the option of first degree felony murder or second degree murder based on the natural and probable consequences doctrine, nor does he contend the killing was less than murder, i.e., manslaughter. His sole complaint goes to the instruction negating the requirement of unanimity as to theory, which in this case, applies to the issue of degree of the murder. Assuming some jurors relied on felony murder and others on the natural and probable

18

consequences doctrine, we hold that all 12 jurors found the elements of malice aforethought necessary for second degree murder.

"Murder is the 'unlawful killing of a human being . . . with malice aforethought.' (Pen. Code, § 187, subd. (a).) . . . Murder is 'of the second degree' if it is not of the first [citation], which means that it is simply an unlawful killing with malice aforethought." (*People v. Lee* (1999) 20 Cal.4th 47, 70.) "Malice aforethought 'may be express or implied.' (Pen. Code, § 188.) 'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] . . . [P]roof of unlawful 'intent to kill' is the functional equivalent of express malice. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1114 ['Pursuant to the language of . . . section 188, when an intentional killing is shown, malice aforethought is established.'].)" (*People v. Swain* (1996) 12 Cal.4th 593, 600-601, fn. omitted.) The only theory of first degree murder in this case was murder in the perpetration of kidnapping. (§ 189.)

Here, any jurors who voted guilty on the theory of felony murder, based on a murder committed during the commission of a kidnapping, necessarily found the presence of malice. "Simple kidnapping has . . . been held to be a felony inherently dangerous to human life which may support a conviction of second degree felony murder. (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1298.)" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 377.)[12] Moreover, the felony-murder rule "simply describes a different form of malice under section 188. 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' ([*People v.*] *Hansen* [(1994)] 9 Cal.4th [300,] 308.)" (*Chun, supra,* 45 Cal.4th at p. 1184; *People v. Friend* (2009) 47 Cal.4th 1, 75-76.) A verdict based on murder during the course of a

---

[12] *Greenberger* involved a murder committed prior to the amendment to section 189 in 1990, which designated kidnapping as a predicate felony of first degree murder.

19

kidnapping therefore was a murder committed with malice, which supports a minimum finding of second degree murder.

Alternatively, any juror who may have voted for guilt under the natural and probable consequences theory also found malice. In response to the jury's question regarding the definition of second degree murder, the trial court defined second degree murder as requiring either express or implied malice. Thus, a verdict of guilty of murder in this case, under both theories, satisfies the elements of second degree murder—an unlawful killing with malice aforethought.

We therefore conclude the correct remedy is to remand the cause to the trial court. The prosecution may either elect to retry defendant in pursuit of a first degree murder conviction, or allow a conviction of murder in the second degree to be entered. (See *People v. Woods* (1992) 8 Cal.App.4th 1570, 1596; *People v. Morse* (1992) 2 Cal.App.4th 620, 653-656.)

## G. *Sentencing Error*

The Attorney General contends the trial court imposed unauthorized sentences as to counts 2, 3, and 4, and the case must be remanded for re-sentencing as to those counts. Defendant does not contest this argument, except to emphasize that, with respect to count 3, the trial court was authorized to run the sentence concurrently with count 2.

We agree with the parties that the trial court properly exercised its discretion in choosing a consecutive term in count 2, choosing a concurrent term in count 3, and staying count 4. Those aspects of the sentences were authorized and will not be disturbed on appeal. The term lengths of the sentences on all three counts were unauthorized, however, and must be modified as follows:

For the attempted carjacking conviction in count 2, the trial court imposed a term of 10 months, which was one-third the midterm of 30 months, and a 10-year enhancement for firearm use to run consecutively to the indeterminate term imposed on

the murder in count 1. We presume, as the Attorney General does, the trial court relied on section 1170.1, subdivision (a) in imposing this sentence.

"Section 1170.1 sets forth the sentencing protocol for felony offenses for which a determinate low, middle or upper term of incarceration is imposed. It also sets forth the rules for imposing a consecutive sentence through the designation of 'principal' and 'subordinate' terms. First, the trial court is required to select a base term—either the statutory low, middle or upper term—for each of the crimes. (§ 1170; Cal. Rules of Court, rule 4.405(2).) Second, if the court determines that a consecutive sentence is merited, it must designate the crime with the 'greatest' selected base term as the principal term and the other crimes as subordinate terms. (§ 1170.1, subd. (a).) Third, the court sentences the defendant to the full base term it selected for the principal term crime and one-third of the middle term for any crimes for which the sentence is ordered to run consecutively. (*Ibid.*; see *People v. Felix* (2000) 22 Cal.4th 651, 655 [(*Felix*)].) A subordinate term is one-third of the *middle term* even if the trial court had initially selected the lower or upper term as the base term." (*People v. Neely* (2009) 176 Cal.App.4th 787, 797-798 (*Neely*).)

It appears that, in this case, the trial court treated the indeterminate term imposed on count 1 as the principal term and then selected one-third of the middle term on count 2, which it treated as the subordinate term. However, section 1170.1 is not applicable to indeterminate terms. Indeterminate and determinate terms are calculated separately, because the inmate must first serve the determinate term before starting to serve the life term. (Cal. Rules of Court, rule 4.451(a); § 669; *Felix, supra,* 22 Cal.4th at p. 659; *People v. Garza* (2003) 107 Cal.App.4th 1081, 1085, 1094 (*Garza*); *People v. Lyons* (1999) 72 Cal.App.4th 1224, 1227-1229.) A determinate term imposed to run consecutively to an indeterminate term does not constitute a subordinate term within the meaning of section 1170.1, and is therefore not subject to the limitation of section 1170.1, subdivision (a), which requires that the subordinate term be set at one-third the middle term. (*Neely, supra,* 176 Cal.App.4th at pp. 797-799; *Garza*, *supra*, at p. 1094.) To the contrary, the trial court was required by law to impose a full term on count 2. (See, e.g.,

21

*Neely*, *supra*, at pp. 797-799.)  Therefore, the sentence as to count 2 was unauthorized and must be corrected.  (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [an illegal or unauthorized sentence may be corrected at any time, even where the new sentence is more severe than the original sentence].)

For the second degree burglary in count 3, the trial court sentenced defendant to a concurrent term of one year, or one-third the midterm of three years, for the underlying robbery and a ten-year enhancement for the firearm use.  We presume, as with count 2, that the trial court relied on section 1170.1, subdivision (a), in imposing this sentence.  Section 1170.1, subdivision (a), however, does not apply to concurrent sentences.  (*People v. Thompson* (2009) 177 Cal.App.4th 1424, 1432 ["'Because concurrent terms are not part of the principal and subordinate term computation under section 1170.1, subdivision (a), they are imposed at the full base term, not according to the one-third middle term formula . . . .'"].)  Accordingly, the court may impose a concurrent term, but is required to select either the lower, middle, or upper term.

For possession of a firearm by a felon in count 4, the trial court failed to specify a term before staying the sentence under section 654, as required.  (See *People v. Duff* (2010) 50 Cal.4th 787, 796.)  On remand, the trial court must impose a term before staying execution of the term on that count.

## DISPOSITION

The conviction for first degree murder is reversed and the matter is remanded for a new trial.  Unless the People bring defendant to trial within the term prescribed by law after issuance of the remittitur, the trial court shall proceed as though the judgment on appeal had been reduced in count 1 to second degree murder.  With respect to the sentences on counts 2, 3, and 4, the matter is remanded to the trial court for resentencing.  In all other respects, the judgment is affirmed.


KRIEGLER, J.


I concur:


MOSK, J.

23

People v. Cesar Sanchez
B241561
Turner, P.J. Dissenting

I respectfully dissent from the conditional reversal of the first degree murder conviction. I would affirm the first degree murder conviction of defendant, Cesar Sanchez.

The basis of my dissenting views is that no federal constitutional error occurred. In my view, the jurors were instructed as to the elements of the offense. I do not believe the United States Constitution required that greater clarity be provided then was. No doubt, the use of the words theory and theories with the instruction there need not be agreement as to a theory was error. But I do not believe this was federal Constitution error. Therefore, any error resulting from a lack of clarity concerning the words theory and theories is subject to review under article VI, section 13 of the California Constitution. (*People v. Breverman* (1998) 19 Cal.4th 142, 164-179; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The potential confusion is not such so there is a reasonable probability of a different result had it never occurred--thus I would affirm. But I agree though with my colleagues that, if I am incorrect and federal constitutional error occurred, it was sufficiently prejudicial to require conditional reversal. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Our Supreme Court has explained the basis for finding federal constitutional instructional error: "[T]he United States Supreme Court has held that jury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *Carella v. California* (1989) 491 U.S. 263, 265 (*per curiam*); *People v. Kobrin* (1995) 11 Cal.4th 416, 422-423 & fn. 4 [collecting cases].) Such erroneous instructions also implicate Sixth Amendment principles preserving the exclusive domain of the trier of fact. (*Carella v. California*, *supra*, 491 U.S. at p. 265; *People v. Kobrin*, *supra*, 11 Cal.4th at p. 423.) 'Thus, although a judge may direct a verdict for the defendant if the evidence is

legally insufficient to establish guilt, he [or she] may not direct a verdict for the State, no matter how overwhelming the evidence. [Citations.]' (*Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 277; *People v. Kobrin*, *supra*, 11 Cal.4th at p. 423.) The prohibition against directed verdicts for the prosecution extends to instructions that effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt. (*United States v. Gaudin* (1995) 515 U.S. 506, 510-511, 522-523; *People v. Kobrin*, *supra*, 11 Cal.4th at pp. 423-424; *People v. Hedgecock* (1990) 51 Cal.3d 395, 407.)" (*People v. Flood* (1998) 18 Cal.4th 470, 491-492.) There is no requirement the instruction in fact prevented the jury from finding proof beyond a reasonable doubt. Rather, the alleged error must be such that there is a *reasonable likelihood* it relieved the prosecution of proving each element of the charged offense beyond a reasonable doubt. (*Waddington v. Sarausad* (2009) 555 U.S. 179, 190-191; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) In assessing whether federal constitutional error occurred, the instructions are viewed as a whole. (*Waddington v. Sarausad*, *supra*, 555 U.S. at p. 191; *Cupp v. Naughten* (1973) 414 U.S. 141, 147.) Only after a reasonable likelihood the instruction relieved the prosecution of its burden of proof must an appellate court engage in harmless error analysis.

The jury was instructed as to the elements of first-degree felony murder-kidnap. Further, the jurors were instructed they must unanimously agree as to the degree of murder. And, the jurors were instructed they must unanimously find guilt beyond a reasonable doubt. The jurors discovered that the trial court had neglected to define second-degree murder in its initial instructions. It was in this context, responding to a jury question for a definition of second degree murder, that the trial court gave the instruction with the following flaws. The jurors were told that felony murder-kidnap was a theory. The jurors were also told that malice aforethought (express or implied under the natural and probable consequences doctrine) was a theory. The jurors were then told, "You do not all need to agree on the same theory." If this was all that was said on the subject the degree of homicide, that would end the matter in my view--defendant would be entitled to a conditional reversal. That would be federal constitutional error. Why--

2

there is a reasonable likelihood using the words theory and theories relieved the jurors of the duty of finding the elements of felony murder-kidnapping beyond a reasonable doubt. The instruction incorrectly treated this requirement as a theory which did not require agreement by the jurors. But that was not all that was said. Earlier the jurors had been instructed they must agree unanimously as to the degree of a homicide. And, after instructing as to natural and probable consequences (second-degree murder), the trial court concluded its supplemental instructions, "If you decide that the defendant . . . committed murder, you must then decide whether it is murder of the first or second degree." The only instruction concerning the jurors' duty relating to determination of the *degree* was that they must agree unanimously beyond a reasonable doubt.

My view is no federal constitutional error occurred. I agree with defendant that the confusing use of the words theory and theories when discussing malice aforethought and felony murder during the supplemental instructions was error. A corollary of that is the language that the jurors did not need to agree on the same theory was likewise error; a contention with which I agree. However, the jurors had been previously instructed that they must agree as to the degree beyond a reasonable doubt. Further, in concluding its supplemental instructions, the trial court reiterated that once the jury decided defendant committed murder, they must then proceed to determine the degree. And the only instruction given concerning determination of the degree required that it be unanimous. And, as noted, every single element of first-degree and second-degree murder was provided to the jury. There is not a reasonable likelihood the erroneous use of the words theory and theories relieved the prosecution of proving the elements of the offenses beyond a reasonable doubt. This is a very, very close issue but I come down on the side that no federal constitutional error occurred. And, as I have explained, I do not believe there is a reasonable probability of a different result had the trial court not misused the term theory or theories.

Complicating matters is that there is no federal constitutional right to a unanimous jury verdict in a noncapital case. (*Apodaca v. Oregon* (1972) 406 U.S. 404, 406 (lead

opn. of White J.); see *Schad v. Arizona* (1991) 501 U.S. 624, 634, fn. 5.)  In that sense, it is unclear how the use of the words theory and theories contravened the federal Constitution.  However, I do not think the constitutional federal non-unanimous verdict rule in noncapital state cases has anything to do with the outcome here.  The error asserted by defendant is the misuse of the words theory and theories relieved the jury of finding all of the elements of felony murder-kidnap.

TURNER, P. J.