Filed 8/1/18

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>JAMES ADAM WEBB,<br><br>   Defendant and Appellant. | D073592<br><br><br><br>(Super. Ct. No. FMB1400437) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Rodney A. Cortez, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

---

*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part 1.

A jury convicted James Adam Webb of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true the special allegation of using a knife in the commission of the offense (§ 12022, subd. (b)(1)).  On appeal from the judgment, Webb argues the court had a sua sponte duty to instruct the jury on the defense of duress (CALCRIM No. 3402).  He also claims CALCRIM No. 548 erroneously instructed the jury it did not need to agree on the *theory* of murder when the two theories corresponded to different *degrees*.  As we explain, remand is required solely for a restitution hearing, but in all other respects we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Webb lived in a recreational vehicle (RV) parked adjacent to another RV belonging to John R.  As Webb would later admit, on August 25, 2014, he entered John's RV, bound him with rope, sprayed him with pepper spray, and drove the RV away.

Webb interacted with several friends that night.  Still driving John's RV, he first went to a motel where his friend Gina and her husband were staying.  He told them he had done something wrong and might have killed someone, but they did not believe him.  He returned later to say he had killed someone and needed help getting rid of the body.  They told Webb to leave.

Around 1:00 a.m. Webb encountered his friend "T" in a parking lot.  He told her he needed to cash a check from an old man, and she suggested a liquor store.  T's acquaintance, Jeff, rode up on a bicycle and pulled a knife out from Webb's pocket.  The

---

[1]     Further statutory references are to the Penal Code.

2

knife had blood on it, as did Webb's hands. Webb looked at them and said, "I tell you right now, I killed that fuckin' old man in that motor home, and you're going to help me dispose of the body." Not believing him, Jeff tried to lick the knife. Webb pulled it away, saying it was blood. Webb told T he had snapped and stabbed the victim after he objected to a shirt Webb was wearing. Reaching for a set of keys, he asked T if she wanted to go inside John's RV to "see"; T declined. Webb said he did not want to go to prison for "the rest of his life." He later told T and Jeff, "By the way, whatever I said to you earlier is just bullshit, just forget it."

Meanwhile, Gina called her friend Rebecca to convey what Webb had stated. Rebecca told her friend Adam, who was concerned. Rebecca, Adam, Gina, and Gina's husband set off in two cars to search for Webb. When they found John's RV in a parking lot, Adam called 911.

Deputies from the San Bernardino County Sheriff's Department arrived. They found John's body inside the RV. His legs and wrists had been bound, and there was evidence he had been hit with pepper spray. There were multiple blunt force injuries. The cause of death was heavy bleeding from lacerations to the neck.

Deputies located and arrested Webb that night. Webb had John's RV keys in his possession, and the shoes he wore matched prints found outside John's RV. Webb's fingerprint was on a can of pepper spray found in John's RV. Surveillance videos showed Webb driving John's RV to various places.

Webb agreed to speak with deputies. Although his story changed several times, he consistently tried to implicate Adam and another person named Tim as gang members

3

and the actual killers.[2] No evidence linked Adam or Tim to the crime or to any gang. Both denied gang membership at trial. Tim and his girlfriend had been living off and on with Webb. A couple of days before the murder, Webb told Tim's girlfriend that the victim was wealthy, and he planned to knock him out to take his RV.

Earlier on the day of the murder, Adam and Tim went to Webb's RV to retrieve Adam's credit card and Tim's belongings. Upset that he could not locate his card, Adam ripped out several wires from the carburetor of Webb's RV.

Midway through trial, Webb was arraigned on a fourth amended information alleging a single count of murder and that he personally used a knife. The jury was instructed on second degree murder based on malice aforethought. (CALCRIM No. 520.) It was also instructed on first degree felony-murder with the underlying felony being a kidnapping during a carjacking. (CALCRIM Nos. 540A & 540B.) Over the People's objection, the jury received an instruction on the necessity defense. (CALCRIM No. 3403.)

The jury convicted Webb of first degree murder and made a true finding on the allegation that, in the commission of the offense, he personally used a deadly and dangerous weapon, a knife. (§§ 187, subd. (a), 12022, subd. (b)(1).) The court sentenced him to 25 years to life for the murder, plus 1 year for the weapon allegation. He received credit for time served of 700 actual days. Among other fines and fees, the court ordered

---

[2] To avoid repetition, we discuss Webb's statements in greater detail in our discussion.

restitution of $5,000 to reimburse the Victim Compensation Board for the victim's funeral expense.

DISCUSSION

The People concede that Webb is entitled to a restitution hearing on remand.[3] We therefore focus our attention on Webb's remaining claims of instructional error. Webb argues the court had a sua sponte duty to instruct the jury on the defense of duress based on statements he made to Sheriff's deputies. He further contends that the court erred in instructing the jury it did not have to agree on the theory of murder under CALCRIM No. 548.

1.      *Duress*

The defense of duress applies to defendants "who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26, subd. (6).) Duress is not a defense to murder. (*People v. Landry* (2016) 2 Cal.5th 52, 93; *People v. Anderson* (2002) 28 Cal.4th 767, 780.) Nevertheless, it "can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony." (*Anderson,* at p. 784.) "A trial court is required to instruct sua sponte on a duress defense

---

3      At sentencing, the court ordered Webb to pay $5,000 in restitution to the Victim Compensation Board pursuant to section 1202.4, subdivision (f)(2). It denied his request for a restitution hearing. "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1); see *People v. Lockwood* (2013) 214 Cal.App.4th 91, 96 ["the defendant is entitled to a hearing to dispute the amount of restitution"].)

if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case." (*People v. Wilson* (2005) 36 Cal.4th 309, 331 (*Wilson*).)

Webb argues the court erred by failing to instruct the jury sua sponte on the defense of duress. He claims there was substantial evidence to support the instruction based on his statements to deputies that he had been forced to participate in the kidnap-carjacking by Adam and Tim, who were gang members and had threatened him. As we explain, we question whether there was sufficient evidence to warrant an instruction. Even if there was, any error in failing to give it was harmless based on the jury's finding that Webb personally used a knife in the commission of the crime.

a.     *Additional background*

During his interviews with law enforcement, Webb offered shifting accounts of what happened but tried consistently to minimize his role. He claimed Adam and Tim were gang members who were "taxing" him, making him fear for his life. He said Adam and Tim forced him to bind John so they could steal his RV. In one retelling, Tim pulled a knife on him and said he wanted John's RV. In another, Adam pulled a gun on him and implied that he was "done" unless he participated in the kidnap-carjacking. In yet another account, Tim and Adam pulled a knife to his throat and told him that if he helped them, they would leave him alone and let him keep his own RV and/or leave town.

Webb initially claimed he was not able to go through with the plan, so Tim entered the RV and shot John. He said this happened during daylight in a store parking lot, but the story changed after the deputy mentioned possible surveillance footage. He then admitted to binding John and driving his RV to a meeting point, where Adam killed him.

6

He claimed he was then ordered to drive to Los Angeles but drove the wrong way toward Palm Springs.

Webb initially admitted hitting John with a flashlight, but he later said it was Tim who did that. In another retelling, he pepper-sprayed John, but Tim was the one who slit John's throat with a knife. Later still, he claimed Tim made the initial cut but Adam cut John's throat again to ensure he bled to death. Throughout these varied accounts, Webb consistently denied using a knife. He initially admitted driving the RV to the parking lot where it was found but later suggested he stumbled upon it there when he ran into T.

The deputy pressed Webb to explain the inconsistencies. When he asked Webb to explain the pepper spray on his shirt, Webb at first claimed it was dog feces, dirt, or body spray. The deputy asked Webb why others claimed they saw him with a knife when he had denied carrying one. Webb replied that he had looked at a knife that T was carrying in *her* pocket. Although Webb told the deputy he went to Gina so that she could call police, he struggled to explain why he was then apprehended while fleeing from law enforcement. When asked how many times he had lied during the interview, Webb admitted, "Several." But he stressed that he was upset that Tim and Adam had killed a man and seemed to be framing him. To the end, he denied killing anybody.

b.      *Analysis*

The duress defense is available where "the act was done under such threats or menaces that [the defendant] had (1) an actual belief his life was threatened and (2) reasonable cause for such belief." (*People v. Heath* (1989) 207 Cal.App.3d 892, 900 (*Heath*); see CALCRIM No. 3402 ["defendant's belief that [his] life was in immediate

7

danger must have been reasonable" considering "what a reasonable person in the same position as the defendant would have believed"].)  "The duress defense, through its immediacy requirement, negates an element of the crime - the intent to commit the act." (*Heath,* at p. 901.)[4]

"In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' "  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  Nevertheless, " '[s]ubstantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " ' "  (*Wilson, supra,* 36 Cal.4th at p. 331.)

Webb's shifting accounts provided at best weak evidence to support an instruction on duress.  As the People note, Webb did little to connect Adam and Tim's unspecified threats temporally to his admitted conduct.  (See *People v. Bacigalupo* (1991) 1 Cal.4th 103, 125 (*Bacigalupo*) [no duress instruction was warranted based on vague assertion that the "Colombian mafia" had threatened to kill defendant and his family if unless he carried out the robbery-murder].)  Moreover, there was no evidence besides Webb's statements that Tim and Adam were gang members, raising questions as to whether there was sufficient evidence that Webb's fear of getting "taxed" was *reasonable*.  (See *Wilson,*

---

4    The jury was instructed on the necessity defense based on the same statements Webb made to Sheriff's deputies.  Unlike duress, "[n]ecessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime."  (*Heath, supra,* 207 Cal.App.3d at p. 901.)

8

*supra,* 36 Cal.4th at p. 331 [insufficient evidence to justify duress instruction where defendant claimed he drove at gunpoint but conceded he did not actually see a gun].)

In any event, even if we assume an instruction was warranted, any error in failing to give it was harmless. Contrary to Webb's claim that such an error is "structural" and requires reversal without consideration of prejudice, courts routinely use a harmless error analysis in evaluating the failure to instruct on duress. (*Wilson, supra,* 36 Cal.4th at p. 332 [any error was harmless in light of jury's other findings]; *Bacigalupo, supra,* 1 Cal.4th at p. 125 [same]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99, fn. 31 [error was harmless given jury's verdict on other charges].) Although these cases do not discuss whether the standard is the one applicable to federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) or errors of only state law (*People v. Watson* (1956) 46 Cal.2d 818, 836), any error here was harmless under either standard.

In *Wilson*, the jury's finding that the defendant personally used a handgun in the commission of the murder and robbery showed that it "rejected defendant's testimony that his involvement in the crimes was minor and that [someone else] was the armed robber and actual killer." (*Wilson, supra,* 36 Cal.4th at p. 332.) Any error in failing to instruct on duress as to the underlying felony in that felony-murder case was therefore harmless. (*Ibid.*) The same can be said here. Webb repeatedly lied, kept changing his story, and could not paint a coherent picture linking any threats to his admitted conduct. Not only was there *no* evidence linking Adam and Tim to any gang or the crime, Webb told multiple friends what he did. Despite all of this, even if some jury could believe he acted

9

under duress, it is clear this jury didn't. Webb consistently denied carrying a knife or having anything to do with the actual killing. By finding that he had personally used a knife during the commission of the crime, the jury rejected his versions of events, including any possible theory of duress.

2.      *CALCRIM No. 548*

"In a criminal case, a jury verdict must be unanimous. . . .  Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all jurors agree the defendant committed." (*Ibid.*) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis, or as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*) For example, to convict a defendant of first degree murder, the jury need not unanimously agree on whether it was premeditated or felony murder. (*Id.* at p. 1133.) Likewise, "the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime." (*Ibid.*)

Reflecting this general principle, the jury was instructed with a version of CALCRIM No. 548 stating:

> "The defendant has [] been prosecuted for murder under two
> theories:  (1) malice aforethought, and (2) felony murder.  [¶]  Each
> theory of murder has different requirements, and I will instruct you

10

on both. [¶] You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory, but you must unanimously agree whether the murder is in the first or second degree."

Citing *People v. Sanchez* (2013) 221 Cal.App.4th 1012 (*Sanchez*) and *People v. Johnson* (2016) 243 Cal.App.4th 1247 (*Johnson*), Webb claims that instructing the jury it did not have to agree on the *theory* of murder was erroneous because it implied the jury did not have to agree on the *degree* of murder. He argues CALCRIM No. 548 is misleading where the two "theories" involve different degrees.

"In assessing a claim of instructional error, we examine the instructions as a whole. The test we apply is whether there is a reasonable likelihood the jurors would have understood the instructions in a manner that violated a defendant's rights. [Citation.] In this regard, we presume that jurors are intelligent individuals who are capable of understanding instructions and applying them to the facts of the case before them." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246; see *Sanchez, supra,* 221 Cal.App.4th at p. 1024.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In *Sanchez* and *Johnson* (as here), the jury had to decide between first degree felony murder and second degree malice aforethought murder. (*Sanchez, supra,* 221 Cal.App.4th at p. 1019; *Johnson, supra,* 243 Cal.App.4th at p. 1251.) Instructing the jury under former CALCRIM No. 548 that it did not have to agree on the theory was

11

erroneous because it suggested unanimity was not required as to the *degree* of murder. (*Sanchez,* at p. 1025 ["Unanimity was required in this case as to the theory of guilt as a result of different theories supporting different *degrees* of murder."]; *Johnson,* at p. 1280 ["The flaw in giving CALCRIM No. 548 was that it suggested to the jury that it need not agree on the *degree* of murder."].)

In response to these cases, the Judicial Council revised CALCRIM No. 548 (2015 rev.). Whereas the last line simply read, "You do not all need to agree on the same theory," the following bracketed language was added: "[, but you must unanimously agree whether the murder is in the first or second degree]." Unlike in *Sanchez* and *Johnson*, this jury received the revised instruction and was explicitly told it had to agree on the degree of murder.[5] On the other hand, the given instruction defined malice aforethought and felony-murder as different "theories" and stated unanimity was not required as to the "theory." Although it also stated unanimity was required as to the "degree," the instruction arguably contained an ambiguity.

Webb argues the prosecutor exacerbated the problem by stating in her closing argument, "If some of you believe it was felony murder, some of you believe it was

_____

[5]    The jury also received several other instructions that were also provided in *Sanchez, supra,* 221 Cal.App.4th 1012 and *Johnson, supra,* 243 Cal.App.4th 1247. CALCRIM No. 640 explained how the jury should deliberate over possible degrees of murder and emphasized the need for unanimity at each step. A modified CALCRIM No. 520 told the jury that if it found the defendant guilty of murder, it was of the second degree unless the prosecution proved it was first degree felony murder under either a direct perpetrator or aiding and abetting theory. In its closing charge, the court instructed the jury under CALCRIM No. 3550 that its "verdict on each count and any special findings must be unanimous. This means that, in order to return a verdict, all of you must agree to it."

12

malice aforethought, you do not have to agree on the same theory."  Clearly, she misstated the law, although we question the impact of that one sentence when it was followed by six pages of discussion on alternative theories of *felony murder*.

Ultimately, we need not decide whether the alleged ambiguity in CALCRIM No. 548 amounted to error on the facts of this case.  Even if it did, any error was harmless beyond a reasonable doubt.  (*Sanchez, supra,* 221 Cal.App.4th at p. 1027 [applying *Chapman, supra,* 386 U.S. at p. 24]; see also *People v. Milosavlievic* (2010) 183 Cal.App.4th 640, 647 [*Chapman* applies where instructional error lowers the prosecution's burden of proof].)  Webb admitted binding and pepper spraying the victim and driving away in the victim's RV.  Even if the jury believed (based solely on his own statements) that Adam and Tim were involved, there was no evidence he withdrew to avoid liability for aiding and abetting the underlying felony.  Webb's only defense at trial was legal necessity; on appeal he argues duress, which the jury necessarily rejected for reasons discussed above.  On this record, there is no likelihood the jury did not unanimously agree that he committed felony murder.  To the extent CALCRIM No. 548 could be read to suggest unanimity was not required as to the degree of murder, the error was harmless beyond a reasonable doubt.

## DISPOSITION

The order of restitution to reimburse the Victim Compensation Board is reversed, and the issue is remanded for a restitution hearing.  In all other respects, the judgment is affirmed.

                                                                                    DATO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.