Filed 3/29/22  P. v. Sun CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059629 |
| v. | (Super. Ct. No. 15HF0776) |
| HONGLI SUN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Marilee Marshall for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Acting Senior Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Hongli Sun was convicted of first degree murder for killing his wife's paramour, Xuan Liu. On appeal, he contends the trial court erred by refusing to give his proposed pinpoint instruction on the prosecution's lying-in-wait theory. In addition, he argues the verdict is tainted because the jury was not required to unanimously agree on whether he was guilty under that theory, or the alternative theory of premeditation. Finding these claims unavailing, we affirm the judgment.

FACTS

Appellant and his wife Huaying "Cynthia" Chen immigrated to Orange County from Asia with their infant son in 2008. After they selected Liu as their family dentist, he hired Cynthia to work as a receptionist at his office in Irvine. Then he and Cynthia began an affair that appellant found out about in September 2014.

For the most part, appellant blamed the affair on Liu, thinking he had used his power and wealth to seduce and take advantage of Cynthia. Appellant was also angry with Cynthia but he did not give up on their relationship. In fact, even after filing for divorce in the fall of 2014, he tried to reconcile with Cynthia several times over the next few months. However, every time they got back together, she ended up going back to Liu, leaving appellant feeling betrayed and bitter.

This pattern played out in July of 2015, just before Liu was killed. At that time, appellant and Cynthia were living with Cynthia's parents in Irvine, and Cynthia had just started a new job in Newport Beach. Although appellant suspected she still had feelings for Liu, he had no proof they were actually seeing each other so he stayed the course in the hope that she was over Liu once and for all.

As it turned out, that was not the case. When appellant woke up on the morning of Saturday, July 18, Cynthia's parents told him she was at work. Appellant was doubtful Cynthia's new job required her to work on weekends, and, suspecting the worst, he drove to Liu's office. There he saw Cynthia's car in the parking lot. He also discovered a note on the office door in Cynthia's handwriting. The note said Liu's staff

2

was away for lunch, but they would be back soon, so appellant returned to his car in the parking lot and waited.

According to appellant, he just wanted to talk to Cynthia to find out what was going on; he did not know whether Liu was even at the office that day. But before long, his suspicions were confirmed when a black car entered the parking lot. First, Crystal Huang and another member of Liu's staff exited the car, and then so did Cynthia and Liu. The site of Cynthia and Liu together made appellant mad. He was particularly bothered by the fact they seemed to be flaunting their affair in public.

Appellant testified he planned on just driving away and not doing anything about the situation despite his feelings of anger and despair. But he made eye contact with Cynthia, and her expression reminded him of the first time he confronted her about Liu. He lost control and drove his car into Liu. Liu got up and tried to run away, but appellant exited his vehicle and chased him down. He stabbed Liu 17 times with a large hunting knife, killing him.[1] During the attack, appellant also stabbed Huang in the leg when she tried to intervene. He did not relent until a bystander pulled him off Liu and pinned him to the ground. At that point, appellant said, "It's okay. It's over. I'm done."

Following his arrest at the scene, appellant made several statements to the police. He claimed the reason he waited around in the parking lot was so that he could question Cynthia, not kill Liu. However, when he saw the two of them together, he "snapped" and wanted to kill Liu. He also admitted harboring thoughts of killing Liu in the weeks and months leading up to the attack.

During his closing argument, defense counsel maintained appellant killed Liu in the heat of passion, and therefore he was only guilty of voluntary manslaughter, not murder. However, the jury convicted appellant of murder in the first degree, and also of assaulting Huang with a deadly weapon. It also found true allegations appellant used a

---

[1] Appellant testified he always kept the knife in his glove box for protection; it was not something he brought with him that day to harm Liu.

deadly weapon and inflicted great bodily injury during the attack. The trial court sentenced him to 26 years to life in prison for his crimes.

## DISCUSSION

### *Pinpoint Instruction on Lying in Wait*

Appellant contends the trial court erred by refusing to give his requested pinpoint instruction on the lying-in-wait theory of first degree murder. We disagree.

The prosecution posited appellant was guilty of first degree murder under two theories, premeditation and lying in wait. With respect to the latter theory, the trial court gave the standard instruction found in CALCRIM No. 521, which states:

"The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if: One, he concealed his purpose from the person killed; two, he waited and watched for an opportunity to act; and, three, then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. [¶] A person can conceal his or her purpose even if the person killed is aware of the person's physical presence. [¶] The concealment can be accomplished by ambush or some other secret plan."

As he did at trial, appellant contends this instruction did not go far enough in terms of explaining to the jury that lying in wait requires proof the defendant was waiting with an unlawful purpose in mind, as opposed to just waiting to make inquiry or investigation without a preconceived plan to do harm. Therefore, the trial court should have supplemented CALCRIM No. 521 with the following language:

"The defendant must have intended to conceal his purpose from the person killed, and the purpose of the concealment must have been unlawful, that is, to commit, from a position of advantage, the unlawful act that resulted in the killing. [¶] Waiting

4

only for a purpose of inquiry or investigation, or without a preconceived plan to attack, is not lying in wait. [¶] If you find that the sight of [Cynthia] and Liu emerging together from the car in which they had been riding suddenly caused the defendant impulsively to drive his car toward [them], then the previous period of time in which the defendant had been sitting in his car was not a period of concealment or lying in wait."

Like the trial court, we find this pinpoint instruction was unnecessary to facilitate the jury's understanding of the prosecution's lying-in-wait theory of first degree murder. To be sure, the jury in a criminal case "must be instructed on general principles ""'closely and openly connected to the facts and that are necessary for the jury's understanding of the case'"" including those instructions that 'pinpoint' a defense theory. [Citation.] Pinpoint instructions are not warranted, however, when they are . . . duplicative" of other instructions that were given. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498-499 [defense pinpoint instruction properly rejected since its import was conveyed by other instructions].)

The concealment required for lying-in-wait murder "'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.]'" (*People v. Webster* (1991) 54 Cal.3d 411, 448.) The defendant need not actually harbor the intent to kill or injure while he is waiting. (*People v. Laws* (1993) 12 Cal.App.4th 786, 794-795.)

By instructing the jury that lying-in-wait murder required proof that appellant concealed his purpose in order to make a surprise attack on Liu, the trial court properly and adequately conveyed the concealment requirement. In addition, by virtue of this instruction, the jury would have known the concealment requirement was not satisfied if appellant merely wanted to investigate the situation and question Cynthia about what was going on. Because that mindset is plainly inconsistent with the intent to

5

mount a surprise attack, there was no need for the court to explain this to the jury through appellant's requested instruction.

The jury also would have known the concealment requirement was lacking if appellant acted impulsively in response to seeing Liu and Cynthia emerge from their car, which is the other point appellant's requested instruction was intended to convey. As the prosecutor acknowledged during his closing argument, impulsive conduct is the "polar opposite" of the type of scheming behavior that characterizes lying-in-wait murder, i.e., watching and waiting for the purpose of taking the victim unawares. Given that the trial court's instructions required proof of such behavior in order to find appellant guilty of lying-in-wait murder, his proposed instruction was superfluous, and the court did not err by refusing to give it.

*Unanimity Issue*

Appellant also asserts the trial court erred by failing to give a unanimity instruction to ensure all of the jurors agreed he was guilty of the same theory of first degree murder. Again, we cannot agree.

After explaining the elements of premeditation and lying in wait, the trial court instructed the jurors, "You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. *But all of you do not need to agree on the same theory*." (Italics added.) Appellant contends the italicized sentence violated his right to due process and to present a defense, however, we do not see it that way.

In fact, our Supreme Court has repeatedly rejected the notion that unanimity is required with respect to the theory the jury adopted in finding the defendant guilty of murder in the first degree. (See *People v. Mora and Rangel, supra,* 5 Cal.5th at p. 496 [reiterating the "long-standing rule" that "juror unanimity regarding the theory of first degree murder is not required."].) "Because lying in wait and deliberate and premeditated theories of murder are simply different means of committing the same

6

crime, juror unanimity as to the theory underlying its guilty verdict is not required."
(*People v. Russell* (2010) 50 Cal.4th 1228, 1257.)

Appellant contends the United States Supreme Court's decision in *Ramos v. Louisiana* (2020) _____ U.S. _____, 140 S.Ct. 1390 (*Ramos*) compels a different conclusion. However, in that case, the high court simply determined that the federal Constitution requires verdicts in criminal cases to be unanimous, which is something California law has required for over a century. (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 [noting jury unanimity in criminal cases is compelled under the state Constitution].) "Given California's existing requirement of a unanimous verdict, the Supreme Court's decision [in *Ramos*] has no direct effect on California." (*People v. Wilson* (2020) 56 Cal.App.5th 128, 161, fn. 17.)

Appellant also relies on *People v. Sanchez* (2013) 221 Cal.App.4th 1012 (*Sanchez*) to support his unanimity argument. In that case, the court's analysis hinged on the fact that while juror unanimity is not required when it comes to the prosecution's *theory* of guilt, it is required with respect to the *degree* of the defendant's offense. (*Id.* at p. 1024.) This distinction was important in *Sanchez* because under one of the prosecution's theories, the defendant was guilty of first degree felony murder, and under the other, he was guilty of second degree malice murder. (*Id.* at p. 1022.) Given these circumstances, the failure to require unanimity as to the prosecutor's theory necessitated reversal because it allowed the jurors to convict the defendant of first degree murder without all of them agreeing he was guilty of that offense. (*Id.* at pp. 1024-1026; accord, *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1278.)

Here, however, both of the prosecution's murder theories were for first degree murder. Second degree murder was technically an option for the jury, based on provocation and heat of passion (see CALCRIM No. 522) but neither side argued for a conviction of that lesser offense. Rather, the prosecutor urged the jury to convict appellant of murder one, and defense counsel sought a voluntary manslaughter

7

conviction. Because, unlike *Sanchez*, the prosecution did not argue "different theories supporting different *degrees* of murder" (*Sanchez, supra*, 221 Cal.App.4th at p. 1025), unanimity was not required with respect to its theory of the case.

Instead, the jurors simply had to unanimously agree appellant was guilty of the same offense, that being first degree murder. We know they did because not only were both of the prosecution's murder theories geared toward that offense, the trial court repeatedly instructed the jurors that in order to return a guilty verdict on any of the counts, their decision must be unanimous. (CALCRIM Nos. 640 & 3550.)

In light of these instructions, and everything else the jurors were told, it is exceedingly unlikely they did not all agree appellant was guilty of murder in the first degree. Therefore, reversal is not required. (See generally *People v. Rogers* (2006) 39 Cal.4th 826, 873 [reversal is not required in a criminal case unless it is reasonably probable the jury misunderstood or misapplied the court's instructions in a manner that violated the defendant's rights].)

DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

SANCHEZ, J.

8