Filed 1/14/26  P. v. Holloway CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PAUL PAEZ, <br><br> Defendant and Appellant. | A168883 <br><br> (Alameda County <br> Super. Ct. No. 18-CR-013887A) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DONTE HOLLOWAY, <br><br> Defendant and Appellant. | A168655 <br><br> (Alameda County <br> Super. Ct. No. 18-CR-013887B) |

Defendants Paul Paez and Donte Holloway followed Cindy Le from Oakland to Alameda, attempted to steal her purse, and assaulted her when she resisted, causing fatal head injuries.  A jury convicted both defendants of several crimes, including felony murder, and it found that Holloway

personally used a metal pipe. Paez was sentenced to 25 years to life in prison, and Holloway was sentenced to 50 years to life in prison.

On appeal, Paez claims that insufficient evidence supports his murder conviction on either theory of felony murder presented to the jury, that he was an actual killer or a major participant in the underlying felony of attempted robbery who acted with reckless indifference to human life. He and Holloway both claim that the jury was erroneously instructed on the actual-killer theory and the unanimity requirement and that these errors were individually or cumulatively prejudicial. Finally, Holloway claims that the trial court incorrectly sentenced him on various enhancements and a clerical error in a minute order must be corrected. The Attorney General takes the position that both defendants must be resentenced and that the minute order must be corrected, but he otherwise opposes defendants' claims.

We conclude that substantial evidence supports Paez's murder conviction, and we reject both defendants' claims of instructional and cumulative error. We also conclude that both defendants must be resentenced in light of enhancement-related errors and that the minute order from the bench trial on Holloway's prior convictions requires correction. Therefore, we remand for resentencing, direct the minute order to be corrected, and otherwise affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Le and her husband, Calvin, owned two restaurants called Pho Anh Dao, one on East 18th Street in Oakland and the other on Webster Street in Alameda. Le worked at the Oakland location, and Calvin, their adult daughter, Jennifer, and Jennifer's boyfriend, Robinson, worked at the

2

Alameda location.[1]  Le's routine each night was to close the Oakland restaurant, drive her silver pickup truck to the Alameda restaurant, and spend some time there before driving home with Calvin.

On the night of April 6, 2018, two men followed 61-year old Le from Oakland to the Alameda restaurant and tried to steal her purse after she exited the restaurant with Calvin.  She resisted, and during the ensuing struggle she sustained head injuries that were ultimately fatal.  Eyewitnesses described one of the men as darker-skinned and armed with a rod-like weapon and the other as lighter-skinned.

At trial, Holloway, who is Black and whose DNA was found on Le's purse, conceded that he was the armed, darker-skinned man.  Paez, who is Hispanic and did not leave physical evidence at the scene, contested that he was present at all.  The jury rejected Paez's identity defense, however, and on appeal he does not challenge the sufficiency of the evidence on this point.  Thus, we omit much of the identity-related evidence in our discussion and assume, as the jury effectively found, that Paez was the lighter-skinned man.

A.      *The Assault and Attempted Robbery of Le*

Around 10:30 p.m. on the night in question, Le left the Oakland restaurant in her pickup to drive to the Alameda restaurant.  The Alameda restaurant shares a driveway with the Rodeway Inn.  When one faces the buildings from the street, the driveway is perpendicular to Webster Street, with the restaurant on the left and the L-shaped motel behind and to the right.  The restaurant's entrance is on its right side, facing the driveway, and there is a walkway along that side of the building with a couple steps down to

_____

[1] We refer to Le's husband, daughter, and daughter's boyfriend—who all have the same last name, which is not Le—by their first names to protect their privacy and for clarity.

3

the driveway. Across Webster from the restaurant, there is a Walgreens with a parking lot in front of it.

Rodeway Inn surveillance footage showed Le's pickup arrive at the Alameda restaurant around 10:37 p.m. and park in the driveway, about 15 feet past the restaurant's entrance.[2] Le went inside to wait while Calvin, Jennifer, and Robinson finished closing the restaurant. About 20 minutes later, Le and Calvin left through the entrance and locked the door behind them, as was their custom. Jennifer and Robinson were still inside, planning to leave through the restaurant's back door.

Calvin testified that after exiting the restaurant, he and Le walked toward the pickup. Calvin saw a "tall" man wearing "a jacket with a hood" approaching and "realize[d] that something [was going to] happen." Calvin testified that the man, whom the evidence tended to suggest was Holloway, "pulled" Le's purse, and she "held it back." Calvin tried to push Holloway away, but Holloway kept pulling on Le's purse and was eventually able to take it from her. As Calvin yelled for help, Le ran after Holloway to try to retrieve her purse.

Le grabbed the purse and struggled with Holloway as she tried to pull it away from him. Calvin pushed Holloway again, at which point Holloway pulled out a 14- to 15-inch "stick" and tried to hit Calvin with it. Calvin ducked, calling out that the man had "an axe," and Holloway hit Le on the top right side of her head. Calvin testified that after being hit, Le took a few steps backward and fell down.

Meanwhile, Robinson and Jennifer heard the commotion outside. Robinson testified that he looked through the glass front door and

---

[2] This footage and the other surveillance footage we mention was played for the jury and admitted into evidence.

4

surrounding windows and saw Le and Calvin standing slightly to the left of the restaurant's entrance. Calvin was "trying to push somebody away." Wanting to scare off the person, Robinson ran to the front and began "banging on the window because the door [was] locked." Calvin was "struggling" with the man, whom Robinson's description also suggested was Holloway, and Holloway was "grabbing [Le] mostly" while she "was holding on to her purse."[3]

Jennifer testified that as she was standing by the register, she looked outside and saw her parents standing a few feet away from the front door, "facing someone." She joined Robinson at the front of the restaurant and started banging on the door. She testified that she now saw two men, one "lighter skinned," whom she later identified as Paez, and the other "darker skinned," whom she later identified as Holloway.[4] Paez was "tugging" at Le's purse while Le resisted, and Calvin was pushing Holloway away from Le. Jennifer saw Paez punch Le "[r]ight in the face," but Le "just kept holding on" to the purse. This was the only time that Jennifer saw her mother get hit.

Robinson ran out of one of the restaurant's emergency exits, which was on the Webster side of the building. He ran up the sidewalk and turned into the driveway. Robinson testified that Le was already on the ground, Holloway was with Calvin, and Paez "was about to jump in." Similarly, Calvin testified that after Holloway struck Le with the weapon, he saw

---

[3] In contrast to his testimony at trial, Robinson indicated to the police soon after the incident that Paez was the first man he saw through the window struggling with Le and Calvin.

[4] Jennifer identified defendants for the first time in the courtroom at trial. No other eyewitness to the attack was able to identify Holloway or Paez.

5

"another man" emerge from the walkway and "r[u]n over to fight [Robinson]."[5]

Robinson pushed Paez to prevent him "[f]rom going towards [Le] and Calvin." Paez was near Le, but Robinson did not remember ever seeing him touch her. Robinson and Paez "threw a couple punch[es]" at each other. After noticing that Calvin was "struggling" with Holloway, Robinson "ran over to help." Robinson then went "back and forth a lot between pushing [Holloway] off Calvin and then turning back" to engage with Paez. During this time, Robinson was "getting hit from behind as well."

After Robinson ran outside, Jennifer went to the register to retrieve her keys. She then ran back to the front door, unlocked it, and "rushed" outside. Le was standing on the walkway with Paez, and Calvin and Robinson were in the driveway fighting Holloway.

Jennifer "got in between" Le and Paez, and around the same time Le fell to the ground. Jennifer pushed Paez, and he pushed her back, causing her to fall in the driveway. She saw Le's purse on the ground nearby, grabbed it, and threw it inside the restaurant. Although Jennifer was not paying as close attention to Holloway, at one point she saw him holding what "looked like a crowbar" that was about 16 inches long. He was "'[s]winging" the weapon, but she never saw him hit Le, Calvin, or Robinson with it.

Robinson testified that as he was fighting, Jennifer "came out of nowhere." He saw her move "to grab the purse," and Paez chased after her. Robinson "[tackled]" Paez before he could reach Jennifer, and the two men began fighting again. Robinson was then "hit [on his head] from behind with a weapon" by Holloway.

---

[5] Later that night, Calvin told the police that it was the second man to arrive, not the first, who hit Le with the weapon.

Robinson turned and approached Holloway. As Robinson did so, he held out his arm to block the other man's weapon, which looked like a 14-inch "police baton." Robinson testified that Holloway hit him with the weapon around three more times. Robinson never saw either Holloway or Paez hit Le, Calvin, or Jennifer, whether with a weapon or their hands.

A portion of the fight was captured by the Rodeway Inn's motion-activated surveillance camera facing the restaurant. The footage does not show the assault on Le but shows some of the interaction involving Holloway, Paez, Calvin, Jennifer, and Robinson. Although the footage is unclear, it appears to corroborate some eyewitness testimony, including Robinson's testimony that both defendants hit him and that he tackled Paez after Paez pursued Jennifer.

After Jennifer threw the purse into the restaurant, she screamed for help as Holloway and Paez ran across Webster toward the Walgreens. She then went to help Le, who was "mumbling" and "not coherent." Calvin testified that there was "a lot of blood" on Le's face and he was afraid she was going to die.

Robinson also saw Holloway and Paez run toward the Walgreens and chased after them. The men got into a gray sedan in the store's parking lot, and Robinson took some blurry photographs of the car as it departed.

A carpenter at a job site across the street from the Rodeway Inn witnessed some of these events. He testified that after hearing a woman yell for help, he ran into the Walgreens parking lot, from which he was able to see a "scuffle" by the motel involving four or five people. The carpenter also saw the woman who called for help "crawling on the ground," after which she "tried to stand up and . . . fell back down" onto her hands and knees.

7

The carpenter testified that two men then ran across the street to the Walgreens parking lot, "right towards" him. They got into a Nissan Maxima parked in the lot and exited onto Webster, toward Oakland. Holloway, whom the carpenter described as a darker-skinned man holding a 14- to 16-inch pipe, got into the driver's seat, and Paez, whom the carpenter described as a lighter-skinned man, got into the front passenger's seat.

Robinson called 911 and reported there had been a robbery and he and Le had head wounds. When Le got to the hospital, she was unconscious and had "a very severe head [in]jury," including several areas of bleeding around her brain. As she was "unlikely to make a significant recovery," no surgery was performed. Robinson had wounds to his scalp and arm that required stitches.

B.     Le's Autopsy

A few days after being attacked, Le was taken off life support and died. The pathologist who performed Le's autopsy testified that her cause of death was "blunt injuries to the head." Le had bruising by her right eyelid and down the left side of her face, including a black eye on the left. She had an L-shaped laceration near her left eyebrow, which had been sutured with eight to ten stitches. There was also significant bruising on both sides of her body, including on her right arm, both thighs, and both sides of her chest.

An internal examination revealed that Le had a broken rib on her left side and a skull fracture below her left eye. There was internal bruising above each ear and near the base of her neck. She had a subdural hemorrhage (bleeding between the skull and the brain's surface) on the right side and a subarachnoid hemorrhage (bleeding on the brain's surface) on both sides. Her brain was also bruised.

The pathologist testified that the bruising and laceration on the left side of Le's face could have been caused by being punched, being hit with an object, or falling. Her left black eye could have been caused either by blunt force to that area or the skull fracture itself. The brain hemorrhages could have resulted either from being hit or falling, but the location of the hemorrhages did not necessarily correlate to where on Le's head the trauma was inflicted. It was not possible to say which of the internal injuries—hemorrhaging, brain bruising, and skull fracture—was comparatively the most severe.

The pathologist documented "approximately seven applications of blunt force trauma to the outside of the head," but he could not tell the order in which they were inflicted or whether any given application was caused by a punch, a weapon, or a fall. Because there were head injuries in multiple areas, Le's condition was "not consistent with a simple fall." Rather, her "death came about as a totality of all the injuries [to her head] put together."

C. The Investigation

Alameda police collected surveillance footage from businesses along the route Le drove after she left the Oakland restaurant. The footage showed the suspects' vehicle, a Nissan Maxima with a discolored rear bumper, following Le's pickup from Oakland to Alameda. Using license plate reader images from along the route, the police identified the Maxima's plate number and discovered that Paez's sister owned the car. A records check on Paez showed that he had a criminal record and his photograph matched witnesses' description of one of the suspects.

The police also collected surveillance footage from a Walgreens diagonally across East 18th from the Oakland restaurant. The footage showed that around 9:20 p.m., about an hour before Le left Oakland, the

9

Maxima parked next to the Walgreens in a location with a direct view of the restaurant. A few minutes later, Paez exited the car's front passenger's seat and went into the Walgreens. Footage from inside the Walgreens showed Paez make a purchase, after which he returned to the Maxima and got back into the passenger's seat. The car drove away from the Walgreens at 10:28 p.m.[6]

Surveillance footage was also obtained from the Walgreens across the street from the Alameda restaurant. It showed that right after Le arrived at the restaurant, the Maxima backed into a parking spot in the store's parking lot so that the car faced the restaurant. Holloway and Paez got out of the Maxima, and both attempted to open its trunk before Paez successfully did so. Paez then walked off-camera, in the direction of the restaurant. Several seconds later, after rummaging around in the car's trunk, Holloway followed him.

The footage showed that about 20 minutes later, at 10:59 p.m., Holloway returned to the Maxima and briefly sat in the driver's seat before walking off-camera in the restaurant's direction. About two minutes later, after the fight occurred, Holloway and Paez ran back to the Maxima. Holloway got in the driver's seat, Paez got in the front passenger's seat, and the Maxima drove quickly out of the parking lot.

Surveillance footage from the Oakland apartment building where Paez lived showed the Maxima parked in the building's lot in the days after the incident. Paez could be seen "interacting with" the vehicle, including by driving it. Footage from the morning of April 15, 2018, nine days after the

---

[6] The surveillance footage captured only the passenger's side of the parked Maxima. A crucial aspect of Paez's identity defense was that the footage showed him exit the Maxima about 40 seconds before it pulled away from the curb and did not capture him reentering the car.

incident, showed Paez and Holloway emerge from the Maxima after someone else parked it. Later that day, the car was left in Hayward, from where it was ultimately towed. Paez's and Holloway's DNA was found in the car.

### D. Procedural History

Holloway and Paez were each charged with one count of murder and one count of attempted second degree robbery of Le, and Holloway was also charged with assault with a deadly weapon of Robinson.[7] It was also alleged that Holloway personally used a deadly or dangerous weapon during the murder and attempted robbery and personally inflicted great bodily injury (GBI) during the assault.[8] Various aggravating circumstances as to each crime were alleged under California Rules of Court, rule 4.421.[9] Finally, it was alleged that Paez had one prior serious-felony conviction and Holloway had two prior serious-felony convictions, which also constituted strikes. It

---

[7] The charges were brought under Penal Code sections 187, subdivision (a), 211 (attempted robbery), and 245, subdivision (a)(1) (assault). All further statutory references are to the Penal Code unless otherwise noted.

[8] These allegations were made under sections 12022, subdivision (b)(1) (personal use of deadly weapon), and 12022.7, subdivision (a) (personal infliction of GBI).

[9] All further rule references are to the California Rules of Court. As to both defendants and both the murder and attempted robbery, aggravating circumstances were alleged under rule 4.421(a)(1) (crime involved great violence), (a)(2) (defendant armed with or used weapon), (a)(3) (vulnerable victim), (a)(8) (crime involved planning or sophistication), (b)(1) (violent conduct endangering society), and (b)(3) (prior prison or jail term). As to Holloway only, aggravating circumstances were alleged as to all three crimes under rule 4.421(b)(2) (numerous or increasingly serious convictions) and as to the assault under rule 4.421(a)(1), (a)(2), (b)(1), and (b)(3).

was also alleged that Holloway served a prior prison term for one of these convictions.[10]

The jury was instructed on first degree felony murder and second degree murder. It convicted both defendants of felony murder, finding that each was the actual killer "and/or" a major participant in the attempted robbery who acted with reckless indifference to human life. The jury also convicted defendants of the remaining charges and found true that Holloway personally used a deadly weapon during the murder and attempted robbery and personally inflicted GBI during the assault.

The trial court found true the prior-conviction allegations against Holloway but subsequently struck the earlier conviction for purposes of sentencing under section 1385. The court also found true the aggravating factors that his crimes involved great violence, that he was armed with or used a weapon during them, and that his prior convictions were numerous or of increasing seriousness. As to Paez, the court found true the prior-conviction allegations but later struck the conviction for purposes of sentencing under section 1385. The court also found true the aggravating

---

[10] The prior-conviction allegations were made under sections 667, subdivisions (a)(1) and (e), 667.5, subdivision (c), and 1192.7, subdivision (c), based on second degree robbery convictions under section 211 that each defendant suffered in 2000 and Holloway's conviction of the same crime in 2012. A third prior-conviction allegation as to Holloway was dismissed before it was tried. The prior-prison-term allegation was made under section 667.5, subdivision (a), based on Holloway's 2012 conviction.

Evidence of these prior convictions was admitted at trial under Evidence Code section 1101, subdivision (b). Specifically, the jury was informed that (1) on March 21, 2000, in the same case, each defendant was convicted of one count of second degree robbery with personal use of a lethal weapon, and (2) on September 11, 2012, Holloway was convicted of one count of second degree robbery.

factors that his crimes involved great violence, that he engaged in violent conduct indicating a serious danger to society, and that he served a prior prison or jail term.

Holloway was sentenced to a total term of 50 years to life in prison. The sentence was composed of 25 years to life for the murder, doubled because of the strike.[11]  Concurrent to the indeterminate term, the trial court also imposed a total determinate term of 14 years, composed of the midterm of three years for the assault, three years for the GBI enhancement attached to the assault, five years for the prior serious felony, and three years for the prior prison term.  The two-year midterm for attempted robbery and one year for the accompanying weapon enhancement were imposed and stayed.

Paez was sentenced to 25 years to life in prison for the murder.  The two-year midterm for attempted robbery and five years for the prior serious felony were imposed and stayed.

## II.
### DISCUSSION

A.    *Substantial Evidence Supports Paez's Murder Conviction.*

Paez claims there was insufficient evidence to convict him of felony murder on either of the theories presented to the jury, that he was an actual killer or a major participant in the underlying felony who acted with reckless indifference to human life.  We conclude the claim fails because there was substantial evidence that he was an actual killer.

To evaluate this claim, we consider whether the record contains " 'substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact

---

[11] When announcing its tentative sentence, the trial court indicated it intended to impose a concurrent term of one year for the weapon enhancement attached to the murder, but it never did so.

could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . ."  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Murder is generally defined as "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  But under the felony-murder rule, a killing in the course of committing or attempting to commit robbery and other specified felonies constitutes first degree murder, with "[t]he requisite mental state [being] simply the specific intent to commit the underlying felony." (*People v. Vang* (2022) 82 Cal.App.5th 64, 81 (*Vang*); § 189, subd. (a).)

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) amended section 189 to limit the circumstances under which a defendant may be convicted of felony murder. (Stats. 2018, ch. 1015, § 3; *Vang, supra,* 82 Cal.App.5th at p. 83.)  Under current law, "[a] participant in the perpetration or attempted perpetration of a [qualifying] felony" is guilty of murder only if the person (1) was "the actual killer"; (2) "with the intent to kill," aided and abetted the actual killer in committing murder; or (3) "was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e) (§ 189(e)).)  A jury

14

"need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation" or on one of the three theories of felony murder. (*People v. Nakahara* (2003) 30 Cal.4th 705, 712; see *People v. Grimes* (2016) 1 Cal.5th 698, 728.)

In general, "[w]hen a jury is instructed on two theories of first degree murder, a first degree murder verdict will be upheld [even] if there is insufficient evidence as to one of the theories." (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.)  This is because "where 'the inadequacy of proof' as to one of the theories of first degree murder is 'purely factual,' it is presumed that the jury is 'fully equipped to detect' the deficiency and must have relied on the other, factually valid theory." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1021, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)  Thus, absent "an affirmative indication in the record that the verdict actually did rest on [an] inadequate ground," we uphold the conviction so long as there is sufficient evidence to support one of the theories on which the jury was instructed. (*Guiton*, at p. 1129; *Sandoval*, at p. 424.)  Here, since the record does not affirmatively indicate the verdict's basis, and we conclude there was sufficient evidence that Paez was guilty of felony murder as an actual killer, we need not address whether there was also sufficient evidence of the major participant theory. (See *Sandoval*, at p. 424.)

The parties dispute whether a defendant must have "personally" killed the victim, not just proximately caused the victim's death, to qualify as an actual killer.  We discuss this issue in more detail below in section II.B., with regard to defendants' first claim of instructional error.  We may quickly dispose of the instant claim, however, by accepting Paez's position that substantial evidence of an act that was a "direct and immediate" cause of Le's death was required.

15

Paez claims that the evidence did not permit a reasonable inference that his punch to Le's head contributed to her death sufficiently to establish that he was an actual killer.[12] We disagree. The pathologist testified that Le died from multiple blunt injuries to the head that could have resulted from being punched, which was sufficient for a rational trier of fact to conclude that Paez directly applied force to Le in a manner that was a substantial factor in causing her death. The fact that Holloway used a weapon to hit Le, which suggests his blow was likely to have inflicted more damage than Paez's did, does not undermine our conclusion. As we discuss further below, there can be two actual killers even if one perpetrator's act contributed more to the death than the other's did. (See *People v. Garcia* (2022) 82 Cal.App.5th 956, 964, 967 (*A. Garcia*).) Paez's substantial-evidence claim fails.

B.   *Any Error in Instructing the Jury on the Actual Killer Theory of Felony Murder Was Harmless.*

Holloway and Paez claim the trial court misinstructed the jury on the actual killer theory of felony murder. We conclude that any error was harmless as to both defendants.

1.   Additional facts

As to both defendants, the jury was instructed on felony murder under CALCRIM No. 540A, which pertains to the actual killer theory, and CALCRIM No. 540B, which pertains to the major participant theory. CALCRIM No. 540A, the challenged instruction, is titled "Felony Murder: First Degree—Defendant Allegedly Committed Fatal Act." It provided that to be found guilty, a defendant must have (1) "committed or attempted to

---

[12] Paez made a somewhat different argument in his opening brief. At oral argument, his counsel clarified that the claim is there was insufficient evidence that Paez was an actual killer even accepting the testimony that he hit Le in the head.

16

commit robbery"; (2) "intended to commit robbery"; and (3) "caused the death of another person" "[w]hile committing or attempting to commit [r]obbery." As relevant here, the instruction also provided that "[a] person who was the actual killer may be guilty of felony murder even if the killing was unintentional, accidental, or negligent."

CALCRIM No. 540B, entitled "Felony Murder: First Degree—Coparticipant Allegedly Committed Fatal Act," provided that a defendant could be guilty of felony murder "even if another person," defined as "the perpetrator," "did the act that resulted in the death." (Italics omitted.) One of the required elements of this theory was that "[w]hile committing or attempting to commit robbery, the perpetrator caused the death of another person."

The jury was also instructed on causation under CALCRIM No. 240 as follows: "An act causes injury if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] There may be more than one cause of injury. An act causes injury . . . only if it is a substantial factor in causing the injury. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the injury." (Italics omitted.) And finally, the jury was instructed on second degree murder under CALCRIM No. 520, which used the same language to define causation except for substituting the word "death" for the word "injury."

At the conference on jury instructions, neither defendant objected to the wording of CALCRIM No. 540A or the causation language in CALCRIM Nos. 240 or 520. Paez's trial counsel did object to any argument by the

17

prosecutor that Paez and Holloway were both actual killers.  Relying on *People v. Garcia* (2020) 46 Cal.App.5th 123 (*J. Garcia*), counsel argued that an actual killer must have "personally killed" the victim, not just "proximate[ly] cause[d]" the death.

The prosecutor responded that she *did* intend to argue that both defendants were actual killers, but as "a concurrent cause argument," not "a[] proximate cause argument."  She explained, "[The pathologist] testified there were seven applications of blunt force trauma to [Le's] head.  If any[] one of them is a substantial factor contributing to her death and [both defendants] inflicted blunt force trauma, then they are both actual killers when you look at the causation instruction."  The prosecutor did not disagree with Paez's counsel that "the actual killer is one who personally killed the victim," because if defendants were "both beating [Le] up" and "the cause of death was multiple blunt trauma," they were "both personally killing [Le]."

Consistent with this position, the prosecutor argued in closing that based on the expert medical testimony, defendants could both be convicted of felony murder as actual killers.  She referred back to her argument on causation with regard to second degree murder, in which she contended that the blunt force injuries to Le's head "all caused the brain bleeding that ultimately led to her death" and "were all substantial factors" that "worked concurrently, simultaneously in conjunction to lead to her death."  Because both defendants "inflicted blunt [force] trauma" on Le—Paez by punching her, and Holloway by hitting her with a weapon—both "commit[ted] an act that caused her death" and were "actual killers."

Neither Paez's trial counsel nor Holloway's trial counsel responded to the prosecutor's causation argument in their closings.  Paez's counsel focused on the defense that Paez was misidentified as the lighter-skinned man

18

present.  After conceding that the surveillance footage showed Holloway assaulted Robinson with a metal pipe, Holloway's trial counsel argued that his client was merely a "lookout driver," arrived after the assault of Le and the attempted robbery, and "never touched" Le.

>      2.      Analysis

The parties disagree about the meaning of "actual killer" under section 189(e)(1).  According to defendants, an actual killer must have "personally" killed the victim, not just proximately caused the victim's death.  Despite case law to the contrary, the Attorney General argues that "[t]he correct definition of 'actual killer' is a direct perpetrator whose conduct during an enumerated felony caused the victim's death."  We need not resolve this dispute, because even if defendants are correct, the instructional error was harmless.

We review claims of instructional error de novo.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  Where, as here, the challenged instruction " 'misdescribe[s]' [citation] an element of the charged offense or [is] otherwise 'incomplete and misleading' [citation] with respect to the findings necessary to prove an element of the offense," we assess its prejudicial effect under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  (*People v. Schuller* (2023) 15 Cal.5th 237, 251.)  Under *Chapman*, we must reverse unless "it appears beyond a reasonable doubt that the error did not contribute to [the] jury's verdict."  (*People v. Flood* (1998) 18 Cal.4th 470, 504.)

Before Senate Bill No. 1437 added subdivision (e) to section 189, the term "actual killer" already appeared in section 190.2, the special circumstance statute.  Under the current version of section 190.2, upon a true finding of an enumerated circumstance, "an actual killer" is death-eligible even if lacking an intent to kill.  (§ 190.2, subd. (b).)  The term "actual killer"

19

under this statute has long been interpreted "to mean a person who 'personally killed' the murder victim," by directly inflicting harm. (*People v. Jackson* (2025) 110 Cal.App.5th 128, 158–159, review granted June 11, 2025, S290457; *J. Garcia*, *supra*, 46 Cal.App.5th at pp. 151–152.) This is in contrast to a defendant who merely proximately causes a death, through "an act or omission that sets in motion a chain of events that produces as a direct, natural[,] and probable consequence of the act or omission the death and without which the death would not occur." (*A. Garcia*, *supra*, 82 Cal.App.5th at p. 964.)

*J. Garcia* discussed the meaning of "actual killer" in addressing a robbery-murder special circumstance finding under section 190.2 against one of the defendants, DeAngelo Austin. (*J. Garcia*, *supra*, 46 Cal.App.5th at pp. 129–131; § 190.2, subd. (a)(17)(A).) The evidence showed that several people, including Austin, were present for a home invasion robbery. (*J. Garcia*, at pp. 132–134.) The male homeowner, who had a heart condition, died of asphyxia after duct tape was wrapped around his mouth. (*Id.* at pp. 134, 136.) Although the prosecution argued that the jury could find Austin was an actual killer if he gave the tape to a co-perpetrator who then applied it to the victim's mouth, the Sixth District Court of Appeal held that "only the person (or people) who placed the duct tape on [the victim's] mouth were [the] actual killers under section 190.2[, subdivision ](b)." (*Id.* at pp. 149–150.) Since CALCRIM No. 730, the special-circumstance jury instruction, required only that " '[t]he defendant did an act that *caused* the death of another person,' " it failed to convey that Austin must have personally killed the victim. (*J. Garcia*, at pp. 149–150, italics added.) Finding the instructional error prejudicial in light of the prosecution's

argument, *J. Garcia* reversed the special-circumstance finding. (*Id.* at p. 157.)

More recent decisions followed *J. Garcia* in interpreting "actual killer" under section 189(e). In *People v. Lopez* (2022) 78 Cal.App.5th 1, 4–5 (*Lopez*), the Fourth District Court of Appeal reversed an order denying a petition for relief under former section 1170.95, now section 1172.6, to a defendant convicted of first degree murder with a robbery-murder special circumstance. The victim was found dead in his apartment, various possessions were missing, and the defendant's DNA was on a drinking glass in the bedroom where the murder occurred. (*Lopez*, at pp. 6–8.) The defendant testified that he visited the apartment with an acquaintance and drank a glass of water there but never entered the bedroom and left before the acquaintance did. (*Id.* at p. 9.) In relevant part, the jury was instructed under CALCRIM No. 540A that to convict the defendant of felony murder, it had to find that " '[w]hile committing robbery, the defendant caused the death of another person.' " (*Lopez*, at p. 16, italics omitted.) The jury was also instructed under CALCRIM No. 730 that to find the special circumstance true, it had to find that the defendant " 'did an act that caused the death of another person.' " (*Lopez*, at p. 16, italics omitted.)

*Lopez* concluded that the defendant made a prima facie showing of entitlement to relief under former section 1170.95 because "it was possible the jury had convicted him of felony murder and found the robbery-murder special-circumstance allegation to be true without finding he was the victim's actual killer." (*Lopez*, *supra*, 78 Cal.App.5th at p. 4.) Finding "no reason to believe the Legislature intended for the term actual killer to have a different meaning in section 189(e)(1)" than it did in section 190.2, subdivision (b), *Lopez* relied on *J. Garcia* to hold that "actual killer" under section 189(e)

21

likewise means "someone who personally killed the victim and is not necessarily the same as a person who 'caused' the victim's death." (*Lopez*, at pp. 4, 19.) Since the jury was instructed that it need find only that the defendant "caused" the victim's death to return its ultimate verdict, the record did not foreclose the possibility that the murder conviction was based on a now-invalid theory of felony murder. (*Id.* at p. 20.)

Following *Lopez*, the Third District Court of Appeal held that the term "actual killer" means "the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act." (*Vang*, *supra*, 82 Cal.App.5th at p. 88.) The *Vang* defendant was convicted of first degree felony murder with the special circumstance that the murder was committed during a kidnapping based on evidence that his wife, whom he had physically abused and threatened to kill, jumped out of his truck while he was driving it and died. (*Id.* at pp. 69–75.) The jury was instructed under CALCRIM Nos. 540A and 730 that the defendant could be convicted of felony murder and the special circumstance could be found true if, "while committing the kidnapping, [he] caused the death of another person," and under CALCRIM No. 520 "that an act causes death if the death is a direct, natural, and probable consequence of the act and a reasonable person would know it is likely to happen if nothing unusual intervenes." (*Vang*, at p. 80 & fn. 3.) It was also instructed under CALCRIM Nos. 520 and 620 "that there may be more than one cause of death; and that an act causes death only if it is a substantial factor in causing the death, and the death would not have happened without the act." (*Vang*, at p. 80.) *Vang* concluded that these instructions "ha[d] the same flaw as those in [*J.*] *Garcia*," as "[t]hey allowed the jury to find [the] defendant guilty of felony murder, and to find the special circumstance true, if it determined that [he] 'caused' [the victim's]

22

death based on general causation principles, even if it did not find, beyond a reasonable doubt, that he personally committed the homicidal act." (*Id.* at p. 91.)

Finally, in *A. Garcia*, a different panel of the Third District affirmed the denial of a defendant's section 1172.6 petition for resentencing on his first degree murder conviction. (*A. Garcia*, *supra*, 82 Cal.App.5th at pp. 959–960.) The defendant "physically assaulted and stole money from an 82-year-old man, who died about an hour later from lethal cardiac arrhythmia," and "the prosecution's theory was felony murder" during a robbery. (*Ibid.*) *A. Garcia* rejected the defendant's claim that the trial court erred by denying his petition on the basis he was an "actual killer" under section 189(e)(1) because "there is no 'actual killer' within the meaning of the revised felony-murder rule when death results from a preexisting medical condition aggravated by the stress of the underlying felony." (*A. Garcia*, at p. 960.) Assuming, without deciding, that "actual killer" meant "the person who 'personally' killed the victim," the appellate court determined that the defendant qualified as an actual killer because the record showed that, "acting alone, [he] committed the acts against [the victim] that directly contributed to [the victim's] lethal cardiac arrythmia." (*Id.* at pp. 970–971.)

In reaching its holding, *A. Garcia* noted that there was "nothing in the language of Senate Bill No. 1437 suggesting that the Legislature intended to modify the long-standing rules regarding felony-murder liability in circumstances involving concurrent causes of death." (*A. Garcia, supra*, 82 Cal.App.5th at p. 967.) As the court explained, "[w]hen there is more than one contributing cause of death in a murder case, the law is clear: '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes

23

was the principal or primary cause of death.  Rather, it is required [only] that the cause was a substantial factor contributing to the result.' [Citation.]  The 'substantial factor' standard addresses situations in which there are independent concurrent causes of a death." (*Id*. at p. 964.)  The court observed that Senate Bill No. 1437 was intended "to ensure proportionate punishment for *accomplices* in the felony-murder context," and it opined that "the term 'actual killer' is meant to distinguish the person who actually caused the victim's death, including in circumstances where two or more persons participated in the felony"—a definition the defendant met. (*A. Garcia*, at p. 968, italics added.)

In March 2023, after the cases discussed above were decided and a month before the jury was instructed here, the Judicial Council revised CALCRIM No. 540A's causation element.  Now, instead of requiring that a defendant "caused the death of another person" "[w]hile committing or attempting to commit" the underlying felony (CALCRIM No. 540A (2022 ed.) p. 271), the instruction requires that "the defendant personally committed (an/the) act[s] that directly caused the death of another person."  (CALCRIM No. 540A (2025 ed.) p. 279.)

The Attorney General claims that "[*J.* ]*Garcia*, *Lopez*, and *Vang* incorrectly defined the term 'actual killer,' " which he posits actually means "a direct perpetrator [of an enumerated felony] whose conduct during [that] felony caused the victim's death."  We need not determine whether these cases were wrongly decided.  Even assuming the trial court erred by failing to instruct the jury that an actual killer must have "personally" killed the victim, we conclude the error does not require reversal.  (See *People v. Oyler* (2025) 17 Cal.5th 756, 840, 845 [regardless of whether *J. Garcia* line of cases is correct, any instructional error on concept of "actual killer" was harmless].)

Under *Chapman*, where federal constitutional error has occurred, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) The parties' closing arguments are relevant circumstances on which a court may rely to hold that an instructional error is harmless. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 715–716 & fn. 31 [discussing cases].)

Here, the only acts that the prosecutor argued made defendants liable as actual killers were the direct blows they inflicted on Le, Paez with his fist and Holloway with the metal pipe. Moreover, the jury found that Holloway personally used a metal pipe during the murder, after the prosecutor argued that he did not brandish the weapon but "actually hit[] someone with the weapon." Thus, this is not a case like *J. Garcia* or *Lopez*, in which the jury might have determined that either defendant was an actual killer even if he only proximately caused Le's death through an indirect act during the underlying felony. We agree with the Attorney General that in light of the record as a whole, the failure to instruct that defendants must have "personally" killed Le was thus harmless beyond a reasonable doubt.[13]

In resisting this conclusion, Holloway argues that the jury instructions and prosecutor's argument could have allowed a juror to conclude that he was an actual killer because he "aided and abetted murder by using a pipe against others while Paez punched Ms. Le." But read together, CALCRIM Nos. 540A and 540B make clear that an actual killer is the "perpetrator" of

---

[13] As a result, we need not address the Attorney General's alternate claim that the error was harmless because the jury was correctly instructed on the major participant theory of felony murder.

the killing who commits the fatal act in the course of committing the underlying felony, whereas a major participant is *not* the perpetrator of the fatal act and need only have aided and abetted the underlying felony. Moreover, the prosecutor argued that Holloway could be liable as an aider and abettor for using the pipe against other people when addressing second degree murder, not felony murder. She never argued that Holloway might be an actual killer despite never hitting Le with the pipe.

As for Paez, he claims that the instructional error was prejudicial because the evidence of his guilt was not "overwhelming or particularly strong." We agree that the evidence that Paez inflicted a fatal blow on Le was weaker than the evidence that Holloway did. But the relevant question is not whether the jury could have rationally rejected the theory that Paez was an actual killer. Rather, it is whether the absence of the word "personally" in CALCRIM No. 540A could have caused a juror to find he was the actual killer even if the juror did not believe that he inflicted a direct blow on Le. Based on the instructions as a whole and the prosecutor's argument, we conclude beyond a reasonable doubt that the answer is no.

C.      *There Was No Instructional Error Related to Unanimity.*

Paez, joined by Holloway, also claims that "ambiguities" in two jury instructions addressing the unanimity requirement could have permitted jurors to return a conviction of first degree murder even if they did not all agree that felony murder was committed. We conclude that no error occurred.

1.      Additional facts

As noted, for the murder count the jury was instructed on second degree implied malice murder and first degree felony murder. Before reading the substantive instructions on these offenses, the trial court gave the jury

26

two instructions on unanimity.  First, the court instructed under CALCRIM No. 548 as follows:  "The defendants have been prosecuted for murder under two theories:  (1) malice aforethought, and (2) felony murder. [¶] Each theory of murder has different requirements, and I will instruct you on each. [¶] You may not find a defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories.  You need not all agree on the same theory but you must unanimously agree on the degree of murder."

Second, the trial court instructed under CALCRIM No. 3500 as follows:  "The defendants are charged in Count 1 with second degree murder and first degree felony murder. [¶] The People have presented evidence of more than one act to prove that the defendants committed this offense.  You must not find the defendants guilty unless you all agree that the People have proved that the defendants committed at least one of these acts and you all agree on which act he committed."  Neither defendant objected to these instructions.

In closing, the prosecutor addressed the unanimity requirement for murder at length.  At the outset, she told the jury, "[W]hen I discuss murder, I am going to begin by talking about second degree murder and theories that apply and then I'll move on to talk about first degree felony murder and the theories that apply. . . .  [I]t makes sense in terms of your deliberations . . . to begin with second degree murder before moving on to first degree murder[, b]ecause under the law, there are additional requirements that would convert a murder to a first degree felony murder."  She then explained that "a person can be prosecuted for murder under multiple theories" and that the jurors "all had to agree on the degree of murder . . . [to] return a guilty verdict for murder" but did not "all have to agree on the theory."

27

In addressing second degree murder, the prosecutor identified two possible "theories," "the perpetrator theory and the aider and abettor theory." She also specifically referred to "aiding and abetting implied malice murder" as an "alternative theory under second degree murder" to the theory that both defendants "act[ed] as perpetrators." She repeatedly told the jurors they did not have to agree on "which theory" of second degree murder applied, meaning they could disagree about whether Holloway, Paez, or both inflicted blows that were the "actual cause" of Le's death.

The prosecutor then addressed first degree felony murder, which she characterized as having "additional elements . . . that would convert an otherwise second degree murder" into "a first degree felony murder." She presented two "theories" for felony murder: "the actual killer theory" and the "major participant acting with reckless indifference to human life" theory. The major participant theory, an "alternative theory" to the actual killer theory, would "come into play" only if the jurors did not "all agree that [defendants] jointly and simultaneously caused [Le's] death." After explaining both theories' elements, the prosecutor concluded, "So under either theory, defendants are both guilty of first degree felony murder. You do not have to agree on which theory[, a]nd you can find either theory applies. But if . . . you all agree that this constitutes a first degree felony murder, that is a verdict of guilty under first degree felony murder."

### 2. General legal standards

We review de novo whether a jury instruction correctly states the law. (*People v. Rivera* (2019) 7 Cal.5th 306, 329.) "In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the

28

instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1320.) "We consider the challenged instruction in the context of the instructions and the record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction." (*Rivera*, at p. 329.) In particular, we may conclude that "counsel's arguments clarified an ambiguous jury charge," which "is particularly apt when it is the *prosecutor*'s argument that resolves an ambiguity in favor of the *defendant*." (*Middleton v. McNeil* (2004) 541 U.S. 433, 438.)

When a defendant is charged with murder, "the jury must unanimously determine whether murder is in the first or second degree." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1278 (*Johnson*).) But the jury need not "agree on 'one or more of several theories proposed by the prosecution' " for a particular degree of murder. (*Ibid.*; *People v. Webb* (2018) 25 Cal.App.5th 901, 905–906 (*Webb*).) Applied here, these principles required the jury to unanimously agree either that a given defendant committed second degree implied malice murder or that he committed first degree felony murder. The jury did not have to agree, however, on whether a given defendant was guilty of implied malice murder as a direct perpetrator or aider and abettor or guilty of felony murder as an actual killer or major participant who acted with reckless disregard for life.

Initially, the Attorney General argues that defendants forfeited this claim by failing to object below. He relies on the principle that a party usually may not challenge a jury instruction as " 'too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012.) But

29

defendants claim the jury could have construed the challenged instructions in a way that was "an incorrect statement of the law," which we agree with them is not a claim subject to the forfeiture rule. (*Id.* at p. 1012.) Thus, we will consider the claim on the merits.

Defendants' primary claim is that CALCRIM No. 548 was misleading because it designated "malice aforethought" and "felony murder" as the two possible "theories" of murder. Defendants argue that since the instruction also told jurors they "need not all agree on the same theory" to convict, it was possible they believed these alternate theories could be "mixed" to return a conviction. We are not persuaded.

The last line of CALCRIM No. 548 used to be, "You do not all need to agree on the same theory," without reference to the need for unanimity on the degree of murder. (*Webb*, *supra*, 25 Cal.App.5th at p. 907.) In *People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1014 (*Sanchez*), the prosecution sought to convict the defendant of either first degree felony murder as an aider and abettor of the underlying felony or second degree murder on a now-invalid theory of aiding and abetting. In response to the jury's request for more information about the distinction between first and second degree murder, the trial court gave former CALCRIM No. 548. (*Sanchez*, at pp. 1022–1023.) The jury then convicted the defendant of first degree murder. (*Id.* at p. 1024.) The Court of Appeal reversed, holding that former CALCRIM No. 548 incorrectly informed the jury "that it need not agree on the theory of guilt, even though presented with alternate theories of liability which led to different results as to the degree of the murder." (*Sanchez*, at p. 1025.) Since the record did not indicate that "the jurors unanimously found [that the] defendant committed first degree felony murder" despite the incorrect instruction, the error was prejudicial. (*Id.* at p. 1027.)

Two years later, Division Two of this district decided *Johnson*, in which the jury was also instructed under former CALCRIM No. 548 on "two theories" of murder, first degree felony murder and second degree murder. (*Johnson*, *supra*, 243 Cal.App.4th at p. 1277.) Rejecting the Attorney General's attempts to distinguish *Sanchez*, including because the *Johnson* jury was instructed on multiple theories of felony murder, our colleagues concluded that the instruction was erroneous and the error was prejudicial for the same reasons given in *Sanchez*. (*Johnson*, at p. 1280.)

After *Sanchez* and *Johnson*, the Judicial Council revised the last line of CALCRIM No. 548 to read, as it does now, "You need not all agree on the same theory but you must unanimously agree on the degree of murder." (*Webb*, *supra*, 25 Cal.App.5th at pp. 906–907.) In *Webb*, the Fourth District Court of Appeal addressed a situation where, as here, the jury convicted the defendant of first degree murder after it was instructed under the newer version of CALCRIM No. 548 on two different "theories" of murder, "malice aforethought" and "felony murder." (*Webb*, at pp. 904–905, 907.) Although the challenged instruction "arguably contained an ambiguity" despite requiring unanimous agreement on degree, *Webb* ultimately declined to decide whether the instruction was incorrect because "any error was harmless beyond a reasonable doubt." (*Id.* at p. 907.)

Relying on *Sanchez* and *Johnson*, defendants argue that there is a reasonable likelihood the jury misunderstood CALCRIM No. 548 to permit it "to render an impermissibly mixed finding of guilt for murder." In doing so, defendants fail to address the fact that unlike in those cases, the jury here received the newer version of the instruction requiring unanimous agreement on the degree of murder. True, the instruction is arguably still ambiguous to the extent second degree malice murder and first degree felony murder are

31

defined as "theories" on which the jury need not agree. (See *Webb*, *supra*, 25 Cal.App.5th at p. 907.) Nonetheless, for the reasons that follow, we conclude there is no reasonable likelihood that the jury misapplied unanimity principles in convicting defendants of murder.

We begin by rejecting defendants' claim that CALCRIM No. 3500 "aggravated" CALCRIM No. 548's ambiguity by referring to second degree murder and first degree felony murder "as a single offense." CALCRIM No. 3500 concerns the unanimity requirement for the act on which a conviction is based, not for the degree of murder committed. By referring to the two types of murder as one "offense," the instruction correctly conveyed that count one of the information here was a generic murder charge allowing prosecution for second degree murder *and* first degree felony murder. (See *People v. Rivera* (2021) 62 Cal.App.5th 217, 233–234.) And in requiring the jury to agree unanimously on which "one of these acts" each defendant committed, the instruction clearly meant the multiple acts on which "[t]he People ha[d] presented evidence," not, as defendants claim, the two types of murder. Thus, we disagree with defendants that the instruction's "unification of the two 'acts' as a single offense reinforce[d] the notion that they [were] theories that may be mixed and conflated within a single offense."

We now turn to aspects of the record that establish there is no reasonable likelihood the jury misapplied CALCRIM No. 548. Most importantly, in closing argument the prosecutor clarified the ambiguity in the instruction's reference to "theories." She correctly treated first degree felony murder and second degree murder as two different potential verdicts that required unanimity. She also explained that both types of murder had two different potential "theories," on which the jury did not have to agree, but

she restated CALCRIM No. 548's directive that the jury did have to agree on the degree of murder.

The murder verdict forms reinforced the prosecutor's explanation that unanimity was required for the degree of murder but not the possible theories supporting either degree of murder. The forms convicting defendants of murder stated that each was found guilty of "first degree felony murder . . . in that . . . [he] was the actual killer of Cindy Le . . . [¶] and/or [¶] . . . was a major participant in [robbery or attempted robbery] and acted with reckless indifference to human life." (Some capitalization omitted.) And the unused forms stated that each defendant was guilty of "murder in the second degree . . . in that . . . [he] did unlawfully and with malice aforethought murder Cindy Le." (Some capitalization omitted.) No reasonable juror would believe that returning a verdict of "first degree felony murder"—which explicitly did not require the jury to agree on the actual killer or major participant theory—instead of a verdict of "murder in the second degree" was appropriate if the juror thought defendants were guilty only of implied malice murder.

Disregarding the verdict forms and most of the prosecutor's closing argument, defendants claim that argument actually increased the risk the jury misunderstood CALCRIM No. 548. They focus on the prosecutor's statement that if the jury concluded they committed second degree murder, it should then consider whether "additional elements that . . . convert an otherwise second degree murder to a first degree murder" were met. According to defendants, the prosecutor thereby "presented [second degree implied malice murder] as [a] building block *to* first degree murder," not "a fallback alternative if the jurors should reject first degree felony murder."

In so arguing, defendants assume that second degree murder is not a lesser included offense of first degree felony murder, but this is an unsettled

33

question that our state Supreme Court has repeatedly declined to address. (*People v. Westerfield* (2019) 6 Cal.5th 632, 717.) If second degree murder *is* a lesser included offense of felony murder, then we do not see why the prosecutor's argument was misleading. And even if it is not, the verdict forms and the balance of the prosecutor's argument more than offset any suggestion that the jury could improperly "mix" second degree murder and first degree felony murder to convict defendants of the latter offense.

In short, based on the record as a whole, a reasonable juror would have understood that (1) defendants could be convicted of first degree felony murder *or* second degree malice murder and (2) to return a felony murder conviction, the jury did not need agree on whether the defendant was an actual killer or a major participant in the underlying felony. There is no reasonable likelihood that the jury misapplied CALCRIM No. 548 to defendants' detriment, and their claim therefore fails.

D.     *There Was No Cumulative Error.*

Defendants claim that even if the instructional errors they identify were not individually prejudicial, the errors' cumulative prejudice requires reversal. As explained, however, any error in instructing on the actual killer theory of felony murder was harmless, and the trial court did not err in instructing on unanimity. Thus, there is no prejudice to aggregate, and the claim fails.

E.     *A Remand for Resentencing of Both Defendants Is Appropriate.*

In his opening brief, Holloway claims the trial court erred in sentencing him on enhancements under sections 667, subdivision (a)(1) (prior-serious-felony enhancement), 667.5, subdivision (a) (prior-prison-term enhancement), and 12022, subdivision (b)(1) (weapon enhancement), amounting to an unauthorized sentence. The Attorney General "agree[s] the trial court erred,

34

but not for the reasons Holloway advances," and identifies other errors in both Holloway's and Paez's sentences. Paez's briefing does not address any sentencing errors.

Several of the errors Holloway and the Attorney General raise involve the trial court's exercise of discretion and were forfeited by the parties' failure to object below. (*People v. McCullough* (2013) 56 Cal.4th 589, 594; cf. *In re G.C.* (2020) 8 Cal.5th 1119, 1130.) Nonetheless, we have doubts about whether the trial court in fact exercised its discretion in failing to impose certain enhancements and making other sentencing choices, especially given discrepancies between the court's tentative sentences and its final sentences. There also appears to be at least one error resulting in an unauthorized sentence that the parties do not raise. Under these circumstances, we find it appropriate to remand for both defendants to be fully resentenced so that the court can ensure the sentences reflect its intent in accordance with the law.

In doing so, we decline to resolve the merits of the claims raised on appeal, which the parties may present to the trial court in the first instance. In particular, we express no opinion on Holloway and the Attorney General's dispute about whether the court may impose greater sentences on remand. We do, however, note a few legal principles for the court to keep in mind when resentencing defendants.

First, Holloway's weapon enhancements must be either imposed consecutively or stricken. Such an enhancement cannot be imposed concurrently. (See §§ 1385, subd. (b), 12022, subd. (b)(1).) Second, unless stricken, prior-serious-felony and prior-prison-term enhancements "are added once to each count on which an indeterminate term is imposed and once for the combined counts on which an aggregate determinate term has been imposed." (*People v. Tua* (2018) 18 Cal.App.5th 1136, 1141; *People v. Minifie*

(2018) 22 Cal.App.5th 1256, 1260.) Third, a sentencing court may not impose terms for both a prior-serious-felony enhancement and a prior-prison-term enhancement that are based on the same underlying conviction. (*People v. Scully* (2021) 11 Cal.5th 542, 612.) Fourth, if a prior-conviction enhancement or punishment for it is stricken in the interest of justice, the enhancement should not also be imposed and stayed under section 654. (See *People v. Tang* (2025) 109 Cal.App.5th 1003, 1008–1009.) Finally, and more generally, the trial court should ensure that it sufficiently explains its discretionary sentencing choices on the record. (See rule 4.406.)

F.     *Clerical Errors in a Minute Order Must Be Corrected.*

Finally, Holloway and the Attorney General agree that there are clerical errors in a minute order from a hearing pertaining to Holloway. We will order the errors corrected.

On May 5, 2023, the trial court held a bench trial on Holloway's prior convictions and aggravating factors. The information alleged that he had three prior convictions, but at the hearing the prosecutor moved to dismiss one of those allegations because she did not have any evidence to present. The court then found that Holloway had suffered the other two convictions. In addition, on the prosecutor's motion, the court amended the information so that the prior-prison-term enhancement was under section 667.5, subdivision (a), instead of subdivision (b).

The minute order from this hearing contains two clerical errors. First, although Paez is defined as "Defendant A" and Holloway is defined as "Defendant B," the order states, "The People move to strike/dismiss Defendant A[']s 2nd Prior offense as recited on the record." The order should instead state that it was "Defendant B's" prior conviction the prosecution sought to dismiss. Second, the order does not reflect the trial court's ruling

36

amending the prior-prison-term allegation to be under section 667.5, subdivision (a).  That omission must also be corrected.

III.

DISPOSITION

The sentences are vacated, and the matter is remanded for a full resentencing of both defendants that is consistent with this opinion.  The judgments are otherwise affirmed.  The trial court is directed to amend the May 5, 2023 minute order to reflect that (1) the People moved to dismiss Defendant B's second prior offense, not Defendant A's, and (2) the court granted the People's motion to amend the information to allege that Holloway served a prior prison term under Penal Code section 667.5, subdivision (a).

37

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.



_____

Smiley, J.




*People v. Paez*  A168883

*People v. Holloway*  A168655


38